EMERY WINTERS, Respondent, v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant, No. 43116—252 S. W. (2d) 380.

Division Two, November 10, 1952.

*Warner Fuller* and *Arnot L. Sheppard* for appellant.

*Hullverson & Richardson* for respondent.

610

BARRETT, C.—Emery Winters was employed by the Terminal Railroad as a baggageman. As he was pulling a two-wheeled "nose" or barrow truck through the Union Station's subway a stationary barrow truck to his left was struck from the rear causing the iron handle of the second truck to strike and crush his left hand. A barrow truck is [382] about twelve feet long and has two wheels in the middle and a single wheel at each end which "sort of balances up and down" depending on the load. The wheels at the ends of the truck do not rest on the floor at the same time and as the truck is pulled or pushed both end wheels are off the floor. A barrow truck is so constructed that it swings and pivots readily upon its two center wheels. There is a solid iron handle at each end and the truck weighs about 750 pounds. Winters' truck was loaded with "a corpse" (a casket), hence he had "the right of way" and was in motion pulling his truck with his back towards the east end of it with the palms of his hands on the east end handle with the backs of his closed hands toward the front of his body. George Burlingame, another baggageman, was standing at the head of a line of five or six empty trucks waiting his turn to use elevator eighteen, loosely holding the handle of his truck, when something struck the truck from behind jerking it from his grip and the iron handle on his truck struck Winters' left hand. To recover damages for his resulting injuries Winters instituted this action under the Federal Employers' Liability Act and a jury has awarded him $8000. The Terminal's liability was hypothesized and submitted upon the single specification of negligence that "as Mr. Winters walked by Mr. Burlingame's truck, *an employee of the Terminal Railroad* to the rear of Mr. Burlingame's truck *suddenly and without warning caused the rear of Mr. Bur-*

*lingame's truck to be given a hard jolt,* and that as a result thereof the front end of said truck was turned into and against the left hand of plaintiff, and that Mr. Winters was given no warning of the jolt to Mr. Burlingame's truck and its movement toward him * * *."

The Terminal employs several hundred baggagemen who work various shifts around the clock and the employees are not all personally acquainted with one another. Burlingame and Winters were not acquainted although they recognized one another as Terminal baggagemen. Burlingame described the subway and its physical surroundings and in particularly describing the collision and resulting injury to Winters' hand said, "Well, my truck, *something struck my truck from behind me,* and these trucks like I had, the flat truck swing very easily, they pivot kind of on these two center wheels and due to their weight they will swing one end, will kick out very easily if something should hit it from the other end it will kick out or they are sensitive; you hit a little bump or something in the pavement and if you haven't got a good hold on it, it will swing right—swing out of your hand almost." He said, "And *something hit my truck, I don't know what it was but it hit my truck a blow* and my truck kicked out, the front end of my truck kicked out into the path of Mr. Winters." In describing the force of the collision he said, "*it was a pretty solid jar because it just kicked the truck out of my hold * * * it was a pretty hard lick,* it seemed like to me, because the way it swung around so quick * * *." As to who or what specific truck bumped into Burlingame's truck he said, "I don't know who he was." He could not describe or identify any particular employee in the line of five or six trucks behind him. He said that there were "several employees behind me * * * mail and baggage handlers." He was facing in the opposite direction and did not see "something bump into his truck." He "inquired around of everybody that is usually around at that time of the morning, if they saw what happened, but I didn't get anybody to admit they did." He could not say from his personal observation just what hit his truck. He said, "Well, something solid, that's all, I didn't see it. I didn't see it but I felt it and it was— * * * The impact was solid."

Winters, in describing the occurrence, said that as he proceeded through the subway near elevator eighteen he saw several "flat" (barrow) trucks lined up waiting, each truck with a man—"none of them moving," all facing east and west except that the head truck, Burlingame's, was headed a little bit southwest. As he walked through the five foot space left as a passageway "this front truck all of a sudden it whipped out, *I never seen it because I was in front of it;* it come over against [383] my hand and mashed my hand against the truck I was pulling." He said that he did not actually see the movement of Burlingame's truck,—"Well, I didn't see it but when I turned around it was headed more south than it was." As to the

men and trucks in the standing line he said that there were no trucks in the standing line behind Burlingame except empty "flat" trucks, very close together, a man with each truck. He said that directly to the rear of Burlingame's truck there was a flat truck with a man but he did not know the man's name although he had "seen him around there several times * * * pulling flat trucks and doing Terminal work around there" and "was a Terminal employee." His cross-examination was, "Q. I asked you if you knew who they were. A. By seeing them, yes, sir. Q. But you didn't know the names of any of them? A. No, I didn't. Q. Did you try to find out the names of any of them? A. Well, I asked a few of them. Q. Did you have any luck? A. No." There were no witnesses, other than a doctor, offered by the railroad. It was developed, however, from the plaintiff and his single witness, Burlingame, upon the merits of the cause, that there was nothing to prevent people other than Terminal employees from using the passageway where Winters was injured, and that visitors and employees of other companies walked through that particular section of the subway. And "from time to time," the commissary department of the Wabash used that portion of the passageway.

 Upon this appeal the Terminal urges that the plaintiff's evidence wholly failed to sustain and support the required inferences of negligence hypothesized and submitted, hence, that plaintiff failed to make a prima facie or submissible case and, therefore, the trial court having failed to direct a verdict in its favor, that this court should reverse the judgment with directions that a judgment be entered in favor of the railroad. It is insisted that the evidence does not show a collision between two of defendant's trucks, "violently" or otherwise. Since neither Winters nor Burlingame saw what caused Burlingame's truck to move or saw that another truck struck Burlingame's truck it is said that there is no substantial evidence that another truck in fact struck Burlingame's truck and so no one knows what caused his truck to strike Winters' hand. It is further argued that "There is no evidence that Burlingame's truck was caused to move by the negligent act of anyone. No one knows whose act caused it to move, just as no one knows what act it was which caused it to move. It cannot be said that an unknown act by an unknown person was a negligent act." Finally, since neither Burlingame nor plaintiff saw or knows who did the unknown act, it is urged that "there is no evidence that the unknown person who did the unknown act, who was in the employ of an unknown person, was acting within the scope of his employment as a servant of defendant at the time of plaintiff's accident." It is said, since these four necessary requisites are not proved by the evidence, that the jury necessarily arrived at its verdict by mere speculation and conjecture. Or, alternatively, the Terminal submits that "At best the evidence for plaintiff does no more than present circumstances which might justify factual infer-

ences that plaintiff's hurt was caused by one of two or more causes, 'for only one of which the defendant would be liable'; whereas, the burden was on him 'to show the cause for which defendant was responsible produced the result'" (Krause v. Pitcairn, 350 Mo. 339, 167 S. W. (2) 74), an unpermitted piling of inference upon inference so that the conclusion reached by the jury is too remote and has no sound logical foundation in fact. Wills v. Berberich's Delivery Co., 345 Mo. 616, 134 S. W. (2) 125.

This cause, admittedly, is governed by the Federal Employers' Liability Act (45 U.S.C.A., Sec. 51) and, in interpreting the act and determining this appeal, it is the duty of this court to apply the test of liability as it has been laid down and determined by the Supreme Court of the United States. Boston & M. R. R. v. Coppellotti, 167 F. (2) 201, 204. And the test of liability under the act is *negligence* which that court has defined "as the lack of due care under the circumstances; or [384] the failure to do what a reasonable and prudent man would ordinarily have done under the circumstances of the situation; or doing what such a person under the existing circumstances would not have done." Tiller v. Atlantic Coast Line R. Co., 318 U. S. 54, 67, 63 S. Ct. 444, 451, 87 L. ed. 610, 617. Upon this appeal there is no problem with respect to this general rule and ultimate test of liability. The appellant tacitly concedes, as it must, that it was the duty of its employees in handling their barrow trucks to avoid such a violent collision with other trucks as would endanger fellow employees, and that if as a matter of fact some Terminal employee suddenly and without warning so handled his truck that it collided with Burlingame's truck with such a "hard jolt" that the truck handle struck and injured Winters such conduct would constitute negligence within the meaning of the definition and the act. Mrazek v. Terminal R. Assn., 341 Mo. 1054, 1061, 111 S. W. (2d) 26, 30; Cheney v. Terminal R. Assn., (Mo. App.) 70 S. W. (2) 66.

But the burden is upon the plaintiff to present probative evidence of facts from which negligence and proximate cause may be reasonably inferred. Tennant v. Peoria & Pekin Union R. Co., 321 U. S. 29, 64 S. Ct. 409, 88 L. ed. 520. And the twofold problem presented here is first, whether the requisite and specifically hypothesized facts constituting negligence and proximate cause are a fair and reasonably permissible inference from all the facts and circumstances and, second, the ascertainment of the appropriate rule or tests this court is obliged to apply in determining the presence or absence of the sufficiently probative circumstance. For, once the circumstance sufficient to support the inference appears or can be found in the evidence, the ultimate issue must be submitted to the jury and this court as well as the trial court must necessarily abide the verdict rendered by the jury. Lavender v. Kurn, 327 U. S. 645, 66 S. Ct. 740, 90 L. ed. 916; Tennant v. Peoria & Pekin Union R. Co., supra.

The Supreme Court has not said that a case should be submitted and that a jury may return a verdict based upon and supported by mere speculation. The court has repeatedly said that "the essential requirement is that mere speculation be not allowed to do duty for probative facts, *after making due allowance for all reasonably possible inferences favoring the party whose case is attacked.*" Galloway v. United States, 319 U. S. 372, 395, 63 S. Ct. 1077, 1089, 87 L. ed. 1458, 1473. The test of the presence of reasonably possible inferences, of probative facts and ultimately of submissibility is that "Whenever facts are in dispute or *the evidence is such that fair-minded men may draw different inferences,*" even though thereafter "a measure of speculation and conjecture is required on the part of those whose duty it is to settle the dispute by choosing what seems to them the most reasonable inference. *Only when there is a complete lack of probative facts to support the conclusion reached does a reversible error appear.* But where * * * there is an evidentiary basis for the jury's verdict, the jury is free to discard or disbelieve whatever facts are inconsistent with its conclusion." Lavender v. Kurn, supra.

As we have said the Terminal, in contending that a submissible case was not made, invokes the local rules that a jury may not find a verdict by piling inference upon inference (Strother v. C., B. & Q. R. Co., (Mo.) 188 S. W. 1102, 1105), and that the burden of proof has not been sustained when the evidence proves a state of facts from which, under the law, liability and nonliability may be equally drawn. State ex rel. Dutcher v. Shelton, 249 Mo. 600, 696, 156 S. W. 955, 965. In connection with cases under the act and the test of submissibility, the Supreme Court has not determined to what extent local rules of practice and procedure "may themselves dig into 'substantive rights,' " nor, understandably, has the court attempted to precisely distinguish "substance" and "procedure." Brown v. Western Ry. of Ala., 338 U. S. 294, 70 S. Ct. 105, 94 L. ed. 100. In both majority and dissenting opinions the court has criticized the rule that when the plaintiff's evidence is consistent [385] with the hypothesis that the defendant was not negligent and also with the hypothesis that he was negligent, the proof establishes neither. Mr. Justice Black has said that this dictum means that a judge can weigh conflicting evidence with mathematical precision but a jury cannot. Galloway v. United States, supra. When the proof gives equal support to inconsistent and uncertain inferences the court, in the Tennant case, said, "The very essence of its (the jury's) function is to select from among conflicting inferences and conclusions that which it considers most reasonable." The differences in point of view on the Supreme Court appear to be upon the facts of the particular case and whether reasonably fair-minded men might draw different inferences from the facts and not upon the fundamental tests to be applied. The court found

the facts sufficient to support the necessary inferences in Lavender v. Kurn but insufficient in Moore v. Chesapeake & Ohio Ry. Co., 340 U. S. 573, 71 S. Ct. 428, 95 L. ed. 547, and the fundamental differences of opinion were upon the circumstances and not the tests to be applied.

It is doubtful that there is in fact either a rule of evidence or practice that an ultimate or required fact may not be found by basing or piling inference upon inference. 1 Wigmore, Evidence, Sec. 41, pp. 434, 440. There is and can be no objection to the fact that some material, essential element of a plaintiff's case, or a defense, is not proved by definite, affirmative testimony but is found by the jury's verdict presumably by reasoning and inferring from a fact, or testimony as to a specific subject, or from circumstantial evidence, that a certain required thing or fact existed or was true. Thayer, Preliminary Treatise On Evidence, pp. 193-194; Van Brock v. First Nat. Bank, 349 Mo. 425, 431, 161 S. W. (2) 258, 261. When the statement concerning inference upon inference is employed its probable intended meaning is that "an inference cannot be based upon evidence which is uncertain and speculative or which raises merely a conjecture or possibility," or as the Supreme Court said in the Moore case, "Speculation cannot supply the place of proof." Perhaps the statement is but a convenient way of guarding against what the court considers "attenuated reasoning," or of disposing of evidence which the court regards as too remote or uncertain or as too unreliable in probative force to establish the ultimate fact at issue. Wills v. Berberich's Delivery Co., supra; annotation 95 A. L. R. 162. And, in its final analysis, that is precisely what the appellant contends—that by any standard or test the evidence in support of Winters' case is so speculative, indefinite and uncertain that it has no probative force upon the essential issues of negligence and proximate cause on the part of one of its employees in suddenly and without warning causing Burlingame's truck to be given a sudden jolt.

As we have said, Terminal employees were under a duty to not heedlessly endanger one another and the circumstances of the occurrence support the inference of negligent injury to Winters provided it is also a fair and reasonable inference from the evidence that another Terminal employee caused a Terminal truck to collide with Burlingame's truck. It is undisputed that Winters and Burlingame were Terminal baggagemen and that Winters who had the right of way was pulling a Terminal barrow truck and that Burlingame was standing at the head of a waiting line of five or six trucks loosely holding the handle of another Terminal barrow truck. Burlingame said that something "hit my truck a blow and my truck kicked out, the front end of my truck kicked out into the path of Mr. Winters." In describing the blow he said, "It was a pretty solid jar because it just kicked the truck out of my hold." On cross-

examination he said, "it was a pretty hard lick." Winters did not see Burlingame's truck strike his hand, he was pulling and his back was to both trucks, but when he turned around Burlingame's truck was "headed more south than it was" and he felt the impact and, indisputably, the blow was hard enough to smash his left hand against the iron handle of his truck. The jury could certainly find from these facts that the truck was struck a "hard jolt" as postulated in the instruction. [386] Neither Burlingame nor Winters heard anyone cry "Look out" or "Watch out" and so the blow was sudden and without warning.

The railroad's contention, in its final analysis, is that since there were or could have been persons other than Terminal employees in the subway, and since no one could testify that he saw a Terminal truck collide with Burlingame's truck it is not known who or what caused it to move, hence it cannot be inferred that Winters was injured by anyone, particularly that he was injured by a Terminal employee. As previously indicated, the absence of eyewitnesses is not decisive if the necessary inferences are supportable. Tennant v. Peoria & Pekin Union R. Co., supra; Van Brock v. First Nat. Bank, supra. On the platform level of the Terminal's Union Station there are forty-two tracks, numbered from west to east. Between each pair of tracks there are two platform elevators which operate between the station level and the subway under the station. In the basement subway the elevators are thirty or forty feet apart and are known as the "north" and "south" elevators. The north and south elevators are separated by an iron fence and the north elevators are used by the Terminal Railroad while the south elevators are used by the Railway Express Agency. While it was developed, as the Terminal claims, that people other than Terminal employees used the passageway where Winters was injured, and that "from time to time" the commissary department of the Wabash used it, neither Burlingame nor Winters saw anyone in the passageway other than Terminal employees. The Terminal's mail and baggage trucks are two-wheeled barrow trucks and they are painted yellow. The Railway Express trucks are "bull-wagons," with racks at the front and rear, and they are painted green. As Winters pulled his truck through the passageway there were five or six empty barrow trucks lined up behind Burlingame, waiting to use elevator eighteen, a north elevator. Burlingame could not identify or describe the men behind him, but he said that the men behind him were mail and baggage handlers and that they were Terminal employees. Burlingame did not move his truck and the trucks in line behind him were close together, especially the second truck in the line and that truck was in charge of a Terminal baggageman. Reasonably fair-minded men might draw different conclusions from these facts and circumstances but they are certainly of sufficient

probative force to support the necessary inferences and finding of fact that a Terminal employee so handled one of the Terminal's two-wheeled barrow trucks, suddenly and without warning, that it collided with Burlingame's truck with a "hard jolt," thus heedlessly endangering and injuring Winters' left hand. There is not here a complete absence of probative facts to support the jury's conclusion as there was in Moore v. Chesapeake & O. Ry. Co., supra, and the appellant's negligence as well as proximate cause, under all the circumstances, were appropriately submitted to the jury. Mrazek v. Terminal R. Assn., supra; Schleappe v. Terminal R. Assn., 339 Mo. 562, 98 S. W. (2) 616; Lavender v. Kurn, supra; Tennant v. Peoria & Pekin Union R. Co., supra. The case is not cited by counsel, but virtually the same argument was made in similar circumstances in Cheney v. Terminal R. Assn., (Mo. App.) 70 S. W. (2) 66. There the plaintiff's "dark color" barrow truck was struck by a four-wheeled truck, and the Southeastern Express Company and the American Railway Express Company used four-wheeled trucks—but their trucks were painted light green. There the plaintiff did not know the name of the man pulling the truck that collided with his truck, but it was loaded with mail and baggage. Against the claim that the plaintiff had failed to make a submissible case because there was no evidence that the Terminal owned and operated the truck that struck him, it was held that the issue was for the jury even though there were conflicts in the plaintiff's evidence.

What we have said concerning the essential merits of the case virtually disposes of the appellant's objections to instruction six which, as indicated, hypothesized the plaintiff's theory of the appellant's liability. There was no objection to either the petition or the scope of the [387] testimony and there was evidence from which the jury could find that one of the appellant's trucks suddenly and without warning caused Burlingame's truck to be given a hard jolt, consequently the appellant may not now complain that the submitted issues were broader than the pleadings or the evidence. Mo. R. S. 1949, Sec. 509.500; Doutt v. Watson, (Mo. App.) 231 S. W. (2) 230. As Winters pulled his truck through the passageway he was in plain view of the five or six baggage handlers who were waiting in line with their empty trucks, hence the jury could find that the blow was "suddenly and without warning" and the instruction does not in terms assume the fact. Instruction seven, given at the behest of the appellant, set forth in particular detail the five or six specific facts the jury was required to find before a verdict could be returned in favor of the plaintiff, but instructions six and seven are not thereby so in conflict as to be repugnant, and if any of these specified facts are imperfectly set out in instruction six

the jury could not have been misled or confused. Schonlau v. Terminal R. Assn., 357 Mo. 1108, 1118, 212 S. W. (2) 420, 421.

In its opening paragraph instruction six, before hypothesizing the facts and the plaintiff's theory of the defendant's liability stated that "if you find the facts to be as herein submitted to you, then under the law he has sustained his burden of proof and is entitled to a verdict in his favor." It is urged that this phase of the instruction conflicts with and emasculates the instruction specifically directed to the subject of burden of proof. However, the instructions must be considered as a whole, and when so considered complement one another. In several instances, as against these objections, it has been held that similar instructions, in the particular circumstances, were not so prejudicially erroneous as to require the granting of a new trial. Venditti v. St. Louis Pub. Serv. Co., 362 Mo. 339, 240 S. W. (2) 921, 926-927; Davis v. Kansas City Pub. Serv. Co., 361 Mo. 61, 68, 233 S. W. (2) 679, 682; Lanasa v. Downey, (Mo. App.) 201 S. W. (2) 179, 183.

Instruction number one is a rather long introductory instruction, defining, in general terms, the issues and the word "negligence." In its third paragraph the instruction contains the recital that "Under the provisions of the Federal Employers' Liability Act, every common carrier by railroad, while engaged in commerce between any of the several States, is liable in damages to any person suffering injury while he is employed by such carrier in such commerce if such injury results in whole or in part from the negligence of such carrier or any of its officers, agents or employees." It is urged that this instruction is so misleading and general as to give the jury a "roving commission" to find for the plaintiff upon any theory it might fancy and is therefore prejudicially erroneous. The giving of a similar instruction was criticized as likely to confuse in 1916 in Winslow v. M., K. & T. Ry. Co., (Mo. App.) 192 S. W. 121, 125. But there is no complaint that the instruction does not correctly state the law (45 U.S.C.A., Sec. 51), it is abstract in tenor and does not direct a verdict. It is followed by other instructions which submit the plaintiff's theory of recovery including the specific facts relied upon as constituting liability. In the circumstances, as this and other courts have held, the instruction was not prejudicially erroneous. Hilton v. Thompson, 360 Mo. 177, 191, 227 S. W. (2) 675, 681; Terminal R. Assn. v. Howell, 165 F. (2) 135; Terminal R. Assn. v. Fitzjohn, 165 F. (2) 473.

The plaintiff's evidence made a submissible case, the appellant has not demonstrated such prejudicial error in the instructions as to require the granting of a new trial and the judgment, therefore, is affirmed. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by BARRETT, C., is adopted as the opinion of the court. All the judges concur.