Lloyd REESE, Plaintiff-Respondent,

v.

ILLINOIS TERMINAL RAILROAD COMPANY, a Corporation, Defendant-Appellant.

No. 44014.

Supreme Court of Missouri.

Division No. 1.

Dec. 13, 1954.

Robert C. Ely, Ely & Ely, Alphonso H. Voorhees, St. Louis, for (defendant) appellant.

Sievers, Reagan & Schwartz, St. Louis, Samuel J. Goldenhersh, St. Louis, John G. Dufner, Granite City, Ill., for (plaintiff) respondent.

VAN OSDOL, Commissioner.

This is an appeal from a $30,000 judgment rendered in plaintiff's action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., for personal injuries sustained February 8, 1951, when plaintiff on duty as a switchman in defendant's employ, slipped and fell when operating Switch No. 5 in defendant's McKinley Yards at Madison, Illinois.

Plaintiff had alleged,

"5. That on the date aforesaid, and for several days prior thereto, the weather had been generally inclement and vast amounts of snow, sleet and ice were permitted to gather in the area immediately surrounding a particular switch known as Switch No. 5 in the aforesaid McKinley Yards, so as to cause said area to be unsafe for persons, more particularly the plaintiff, who were charged with the responsibility of discharging various duties there.

"6. That it was the defendant's duty to furnish the plaintiff with a safe place to work and that when the plaintiff was directed to and thereafter did walk upon the area immediately adjacent to said Switch No. 5 and attempted to operate same for the purpose of permitting railroad cars to enter said switch, he was caused to fall when said Switch No. 5 did not respond to his first effort to throw same, thereby requiring plaintiff to expend additional effort and in the process of so doing to lose his footing, because of the negligent condition described in paragraph five above.

"7. Plaintiff further states that the ice, sleet and snow were negligently and carelessly permitted to accumulate and remain around said switch so as to cause the area surrounding said switch to be dangerous and to jeopardize his life, limb and safety * * *."

Defendant-appellant contends defendant's motion for a directed verdict should have been sustained. Defendant-appellant asserts the evidence was insufficient to support a finding that defendant was negligent as alleged—that plaintiff's unequivocal testimony established that he was caused to fall by the sudden release of the switch lever of switch stand No. 5 when the switch mechanism released and closed after it had failed to fully respond upon his first attempt to operate the switch. It is argued that plaintiff may recover, if at all, on negligence as charged, that is, negligence in failing to furnish plaintiff with a safe place to work; and that defendant was not charged with negligence in the maintenance of the switch. Defendant-appellant also contends that the trial court erred in giving plaintiff's Instructions Nos. 1 and 4, and in failing to instruct the jury to disregard improper argument on the part of plaintiff's counsel; and that the amount of the jury's award was excessive.

In defendant's McKinley Yards there are two switch "lead" lines or tracks, the north and south leads. The north lead, a north-south track, has switch tracks, including switch track No. 5, the switch tracks curving off to the southwestward. In switching movements down the north lead and onto switch track No. 5 it is a switchman's duty, if the switch is set for cars to pass on down the lead line, to so operate the apparatus of switch stand No. 5 as to cause the points of the rails of switch track No. 5 to be lined for the passage of cars over onto the switch rather than on down the lead line. The points of the rails of the switch are changed to the realigned position by means of an operation of the handle or lever at No. 5 switch stand, which stand is situate east of the north lead line. A switchman, in operating No. 5 switch, approaches the switch stand and stands "behind it", that is, he faces the west. When the switch stand lever is in "set" or locked right-hand position the outer end of the lever is about thirty inches from the ground, and upon being operated to line the switch for such a movement from the lead line onto Switch No. 5, the lever, being thrown over, describes an arc from the operator's right to his left and normally falls into a new set or locked position with its outer end to the left and again about thirty inches from the ground, and thereupon the switch is locked with the points of the switch rails in desired alignment. If the points of the switch rails are not forced into complete alignment, there is a probability of "splitting a switch" and derailment.

As stated, the points being lined so that cars would pass down the lead line, a switchman, having the duty to line the switch so that cars may pass over onto switch track No. 5, throws the switch lever at the switch stand over from his right to left, "the first three or four inches that you move that handle would unlock it, then it starts moving the points and after it gets over so far, the point closes and you have to shove it on down and it automatically locks itself."

The switch stand at Switch No. 5 is set on two parallel wooden elongated ties projecting out six or eight feet to the eastward of the tracks of the lead line. The ties are about nine inches in diameter and

project approximately two feet to the eastward of the base of the switch stand. There is a space of ten or twelve inches between the elongated ties. The switch stand handle or lever curves somewhat to the eastward, away from the switch stand proper, so that the outer or upper end of the lever is about on a line which, if projected downwardly, would strike a point on the top of the elongated ties about ten inches west of their east ends.

Plaintiff testified that he reported for work February 8th, and was assigned duties as a field man of a switch crew working a shift beginning at four in the afternoon. It had been snowing that morning, continuing up to about noon. When he actually got "out in the field" at about four-thirty it was still daylight, but it was cloudy and cold; the temperature was around twenty-five; there was snow and ice and it was very rough; the snow and ice had been "tramped on"; there were heel prints in it; it was hard and slick. After it had been tramped down, "when I went to work * * *" the ice came up on the ties "not over a quarter or half an inch." It was "a little less" under the switch stand.

Plaintiff had operated the No. 5 switch several times before, and probably four or five times after he was injured, "it just throwed a little hard * * * all the switches gave you a little trouble." If anything gets in there between the switch points and the adjacent rails of the lead "as much as a quarter of an inch they won't close, they won't lock. * * * It could be stone, grease, a little chunk of coal. * * * Most generally you can work it out by throwing the switch a few times." As stated, after he was injured, plaintiff "threw the switch again, the switch was working pretty good, it was working a little stiff * * * there wasn't anything right serious wrong with it."

Plaintiff further testified, that about nine forty-five, he had undertaken to align switch No. 5 so that cars bearing down from the north would pass onto the switch. "I just walked to it, walked up to it like we generally walk up to line a switch.

I grabbed hold of it with my right hand and threw it over, it moved all right until it got might near over there, but it moved hard, then it stopped, it wouldn't lock. * * * I had to shift my position so that I could get my weight on top of the lever. * * * When it gave loose and closed my foot slipped and I went underneath the switch stand." His right foot had been between the elongated ties and his left foot was south of the south elongated tie. His right foot went under the switch stand. He had not had either foot on the ties—

"Q. You don't think you had them on the ties. When this switch gave way, what response did your body give to the circumstances? A. Well, it give me a sudden jerk and a twist that is what caused my foot to slip in that sudden jerk.

"Q. Which way did your foot go? A. Underneath the switch stand.

"Q. In other words, am I correct it went down like this, is that the idea? A. That is right.

"Q. Can you tell us in detail how far it went and what the approximate position of your body was? A. No, I was just all twisted up there, I went as far as I could go and I was hanging onto the handle of the thing.

"Q. But you were able to close that switch, is that right? A. Yes, it closed."

He had not seen any section hands or laborers working on the tracks, spreading salt or cleaning the switches in the area.

Defendant introduced evidence tending to show that its section men, between the hours of five in the afternoon and nine in the evening of February 8th, had swept and salted the switches and switch stands, and salted the areas around the switch stands, in its McKinley Yards.

The testimony of plaintiff tends to show there was a coating of ice under the switch stand No. 5 between the elongated ties

supporting the switch stand, on which ice plaintiff rested his right foot when he was operating the switch mechanism. After the switch had somehow "jammed" and plaintiff had shifted the position of his body to put more weight on the switch lever, the switch suddenly "gave way", plaintiff's body was jerked and twisted, his right foot slipped under the switch stand, and he was injured.

Defendant-appellant is correct in saying that plaintiff actually testified the "sudden jerk" given his body by the sudden release of the switch "caused my foot to slip." But it could be reasonably said plaintiff's evidence tended to show, circumstantially, that ice between the elongated rails went into the cause, or had its part in causing his foot to slip; and we cannot follow defendant-appellant's argument that, necessarily, the cause, in the sense of the only physical cause (or that negligence vel non in the sense of the only legal cause) was the sudden release of the switch. We are of the opinion that, if the ice had not been there, it could be reasonably found from plaintiff's testimony that plaintiff would not have slipped. And, if should be so found, and if it should be further found that the ice between the elongated rails rendered the place dangerous or not reasonably safe and that defendant had been negligent in failing to exercise reasonable care to remedy the unsafe condition, it could be reasonably and finally concluded that the negligent failure to remedy the condition was a proximate cause of plaintiff's injury.

■■■ The Federal Employers' Liability Act does not specifically state a rule that it is the employer's duty to exercise (due, ordinary or) reasonable care in providing the employee with a reasonably safe place to work; but the Act makes the employer liable in damages for any injury to death resulting in whole or in part from his *negligence*. The rights which the Act creates are federal rights protected by federal rather than local rules of law. The federal rules have been largely fashioned from the common law, except as Congress

has written into the Act different standards. Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610. At common law the duty of the employer to use reasonable care in furnishing his employees with a safe place to work was plain. Reasonable care contemplates the precautions commensurate with the dangers to be encountered in the circumstances or, as has been said by the Supreme Court of the United States in cases involving employers' requisite care in furnishing safe appliances and a safe place to work, " 'in all cases it is a question of the reasonableness of the care, reasonableness depending upon the danger attending the place or the machinery.' " Bailey v. Central Vermont Ry., 319 U.S. 350, 63 S.Ct. 1062, 1064, 87 L.Ed. 1444; Patton v. Texas & P. R. Co., 179 U.S. 658, 21 S.Ct. 275, 45 L.Ed. 361; Malone v. Gardner, 362 Mo. 569, 242 S.W.2d 516. The employer is not the insurer of his employee's safety. And, it would seem that the employer has fulfilled his duty to his employee if the appliance or tool or place of work furnished is reasonably safe, or if the employer has exercised reasonable care to make it safe. It has been said that, strictly speaking, the test is not whether the tools to be used and the place in which the work is to be performed are absolutely safe, but whether the employer has exercised reasonable care to make them safe. Atlantic Coast Line R. Co. v. Dixon, 5 Cir., 189 F.2d 525, certiorari denied 342 U.S. 830, 72 S.Ct. 54, 96 L.Ed. 628; Vol. 3, Labatt's Master & Servant, 2d Ed., § 920, pp. 2448–2456.

This brings us to a consideration of defendant-appellant's contention of error in the giving of plaintiff's principal verdict-directing Instruction No. 1, which instruction was as follows,

"The Court instructs the jury that the defendant was under duty to exercise ordinary care to furnish the plaintiff with a reasonably safe place to work, and a failure on the part of the defendant to do so constitutes negligence. Therefore the Court instructs the jury that if you find and believe

from the evidence that on February 8th, 1951, Lloyd Reese, the plaintiff, while employed by the Illinois Terminal Railroad Company * * *, was operating the No. 5 Switch in anticipation of permitting a railroad car to go off the lead onto the No. 5 track, and that while so doing, the No. 5 Switch, when the lever thereof was approximately three to four inches from the place to which it must be moved in order to lock said switch, became jammed or obstructed in some manner, and in order to complete the locking thereof plaintiff was required to situate himself so as to exert the force of his entire weight in the movement of said lever, if you so find, and that at the time and place aforesaid, the area immediately adjacent to and surrounding the said switch was covered with ice and snow which had become irregular and uneven, if you so find, and that the defendant railroad company was negligent in permitting said ice and snow to accumulate and remain in the area immediately adjacent to and surrounding said switch and thereafter to become irregular and uneven, if you so find, and that by reason thereof plaintiff while so exerting the force of his weight in the movement of said switch lever was caused to slip and as the direct and proximate result thereof suffered an injury to his back and lower extremities, then the verdict shall be for the plaintiff and against defendant."

The introductory sentence of plaintiff's Instruction No. 1 correctly but abstractly stated defendant's duty to exercise ordinary care to furnish plaintiff with a reasonably safe place to work, but the instruction did not correctly submit the negligent failure to furnish a reasonably safe place to work. In charging or submitting defendant's negligence, the instruction hypothesized that the area immediately adjacent to and surrounding the switch was covered with ice and snow which had become irregular and uneven and that defendant was negligent in permitting the ice and snow to accumulate and remain in the stated area. Now, in no way did the instruction submit that the irregular and uneven condition was one which was likely to cause injury, that is, the instruction did not actually or in effect submit that the condition was dangerous, or not reasonably safe. See the submitted—by reason of all said facts and circumstances "said place 'was dangerous and not reasonably safe,' et cetera", in Luthy v. Terminal R. Ass'n of St. Louis, Mo.Sup., 243 S.W.2d 332, 336; the required finding by a jury that the place of work was "unsafe because (the flooring was) 'old, worn, rough, depressed and uneven' ", in Schonlau v. Terminal R. Ass'n of St. Louis, 357 Mo. 1108, 212 S.W.2d 420, 424; the submitted, "that said conditions there were likely to cause a person so using said passageway to slip and fall * * * and that said passageway there was dangerous and not reasonably safe for such use and passage," in Fisher v. Laclede Gas Light Co., Mo.Sup., 31 S.W.2d 770, 772; and the submitted, "defendant's roadbed and track were not in a reasonably safe condition * * * on account of * * *", in Gorham v. Kansas City & S. Ry. Co., 113 Mo. 408, 20 S.W. 1060. See also Winslow v. Missouri, K. & T. R. Co., Mo.App., 192 S.W. 121. We believe it could not be said that as a matter of law the condition as testified to by plaintiff and as hypothesized was unsafe, dangerous or not reasonably safe, nor did defendant concede the condition was not reasonably safe. At most, plaintiff's testimony was that the ice (which may or may not have caused plaintiff to slip and fall) was but a thin coating of ice down between the elongated ties. The question of the fact of the dangerous or unsafe character of the hypothesized condition of irregular and uneven ice and snow was a jury question. This question of fact had an essential and basic bearing upon whether defendant had the duty and negligently failed to fulfill its duty to remedy the condition, and the failure to submit such fact, in our opinion, rendered the instruction prejudicially erroneous.

Defendant-appellant also reminds us of the essential element of actual or constructive knowledge of defendant of a dangerous or unsafe condition, and calls

our attention to the fact the Instruction No. 1 did not submit that defendant knew or by exercise of ordinary care could have known of the condition complained of in time by the exercise of ordinary care to have remedied it. In this case plaintiff's evidence tended to show that snow had fallen in the area in the morning of February 8th, the snowfall continuing until about noon. There was no evidence tending to show that snow had fallen in the area in the afternoon or at any later time preceding plaintiff's injury. Plaintiff was injured at about 9:45 o'clock in the evening, so there was an interval of time of approximately nine and three-fourths hours between the noon hour and the time of plaintiff's injury. If we were to assume or if a jury were to find that the area immediately adjacent to switch stand No. 5, particularly the place where plaintiff slipped, was rendered unsafe by reason of the accumulation of ice and snow for such a period of time, it might be urged that the jury could not have reached their verdict for plaintiff without inferring defendant had sufficient knowledge of the unsafe condition. It is the law that where a defect is of "such a nature that the finding of its existence carries with it the clear inference of knowledge of defendant of its prior existence, an instruction omitting such a finding cannot be said to be prejudicially erroneous." Hatfield v. Thompson, Mo.Sup., 252 S.W.2d 534, 543. Schonlau v. Terminal R. Ass'n of St. Louis, supra. Nevertheless, it is the better and safer practice to submit that defendant had actual or constructive knowledge of the submitted dangerous or unsafe condition. Schonlau v. Terminal R. Ass'n of St. Louis, supra; Hatfield v. Thompson, supra.

At defendant's instance the trial court gave Instruction No. 5 which was in part as follows,

" * * *, you are instructed that if you find and believe from the evidence that on February 8, 1951, prior to the time that plaintiff states that he slipped and fell defendant's employees with reasonable care cleaned number 5 switch and placed salt at the switch points and on the ground around the switch stand; and if you find that thereby defendant exercised reasonable care to furnish plaintiff a reasonably safe place to work at the time and place of plaintiff's fall, if you find that he did slip and fall, then your verdict shall be against plaintiff and in favor of defendant."

The Instruction No. 5 hypothesizes facts and submits the negative of defendant's negligence in failing to exercise reasonable care to furnish plaintiff with a reasonably safe place to work at the time and place of plaintiff's fall. Plaintiff's Instruction No. 1, purporting to cover the whole case and directing a verdict, omitting as it does an essential factual finding to the effect that the place where plaintiff fell was dangerous or not reasonably safe, was not cured nor was the omission of the essential factual element supplied or waived by defendant's Instruction No. 5, even assuming that the Instruction No. 5 submitted the negative of all of the essential factual elements of plaintiff's case. Hatfield v. Thompson, supra; Banta v. Union Pac. R. Co., 362 Mo. 421, 242 S.W.2d 34; Higgins v. Terminal R. Ass'n of St. Louis, 362 Mo. 264, 241 S.W.2d 380; McDonald v. Kansas City Gas Co., 332 Mo. 356, 59 S.W.2d 37.

At plaintiff's request the trial court gave Instruction No. 4, as follows,

"The Court instructs the jury that if you find from the credible evidence the facts to be as submitted to you in Instruction No. 1, then plaintiff has met and carried the burden of proof required of him under the law and the instructions herein."

At defendant's request the trial court gave Instruction No. 3, containing the following paragraph,

"The Court instructs the jury that the burden of proof is on the plaintiff to show by the preponderance, that is, the greater weight of the credible evidence in the case that defendant was negligent. * * *"

**224**

Defendant-appellant contends Instruction No. 4 was erroneous because it did not require a finding of "the facts to be as submitted" in the verdict-directing instruction (plaintiff's Instruction No. 1) *by a preponderance or greater weight of the credible evidence*. Defendant-appellant argues that consequently the instruction was in direct conflict with Instruction No. 3, defendant's burden of proof instruction, and prejudicially erroneous. Defendant-appellant cites Warner v. Terminal R. Ass'n of St. Louis, 363 Mo. 1082, 257 S.W.2d 75. It will be noted that Instruction No. 5 given at the instance of plaintiff in the Warner case contained no language equivalent to "by a preponderance or greater weight of the credible evidence" and directly referred to and *qualified* Instruction No. 4 given at defendant's request in that case. It would seem that, if defendant's Instruction No. 4 given in the Warner case, had been a short and simply worded burden of proof instruction as suggested in Mitchell v. Dyer, Mo.Sup., 57 S.W.2d 1082, there would have been an apparent and erroneous circumvention of the prerequisite quantum or weight of plaintiff's burden, by the technically incomplete Instruction No. 5. In our case, considering them together and as a whole, the plaintiff's Instruction No. 4 and defendant's Instruction No. 3, in a way, complement each other. We note the language of plaintiff's Instruction No. 4 given in our case, "if you find from the credible evidence." However, contrast Lanasa v. Downey, Mo.App., 201 S.W.2d 179, wherein the plaintiff's Instruction No. 4 contained the phrase "from the greater weight of the credible evidence." And see Venditti v. St. Louis Public Service Co., 362 Mo. 339, 240 S.W.2d 921. But, see also Winters v. Terminal R. Ass'n, 363 Mo. 606, 252 S.W.2d 380, wherein it was held that plaintiff's Instruction No. 6, given in that case, containing no language equivalent to "by a preponderance or greater weight of the credible evidence", and in which case this court held the instruction, considered together with the other instructions given in that case, was not so prejudicially erroneous as to require the granting of a new trial. However, if the Instruction No. 4, given

in the instant case, had contained the complete language "by a preponderance or greater weight of the credible evidence", then there could have been no question raised, as herein, that the instruction was erroneous or misleading in advising the jury as to the weight of plaintiff's burden of proof.

We shall not consider the question of the excessiveness of the award. The issue of damages (as well as the issue of liability) in complete fairness should be again submitted to the jury.

In this case, plaintiff introduced evidence that his injuries were grave, painful, and permanent; and defendant introduced evidence that plaintiff was formerly injured, and that plaintiff's injuries sustained at Switch No. 5 were not serious in nature and extent and their after-effects imaginary or feigned. Dr. Robert M. Bell was a witness for plaintiff. There was evidence that plaintiff had been examined by Dr. Bell for the Railroad Retirement Board; and there was evidence that plaintiff had been retired by the Board, and was receiving retirement pay. Counsel for plaintiff, in the course of argument remarked about plaintiff's hospitalization up to a time when plaintiff "was refused any additional medical treatment and got himself involved in some litigation." Counsel for plaintiff continued as follows,

"Meanwhile he was examined by Doctor Robert Bell who was selected by the Railroad Retirement Board for that examination, and shortly thereafter received his retirement annuity and was classified as a permanent total disability, unable to work any further.

"Mr. Ely (counsel for defendant): I will have to object to that, I don't believe that is in evidence. I will ask that the jury be instructed to disregard it, what he was classified as, by this doctor.

"The Court: I am not so clear on that, the jury will have to remember that testimony. I don't know whether that was the testimony or not.

"Mr. Ely: I move that the jury be instructed to disregard it. To disregard the argument.

"The Court: The jury will disregard the argument unless they are satisfied that was the testimony.

"Mr. Goldenhersh (counsel for plaintiff): Well, let me put it this way, Reese was rewarded and compensated with for his services a retirement annuity of seventy dollars a month. He is no longer able to work according to Robert Bell and according to Doctor Victor Schermann."

The findings of the Railroad Retirement Board were not in evidence, and no one actually testified that the Board had classified plaintiff as a permanent total disability, unable to work any further. It is doubtful that the Board's findings (or testimony of the Board's findings) would have been admissible; and, if admitted into evidence, the fact of such a classification by the Board, if so, would not have been merely cumulative of the testimony of Doctors Bell and Schermann relating to plaintiff's disability. Anyhow, as stated, the classification of plaintiff by the Board, or by the Board's examiner, as totally and permanently disabled was not in evidence, and we have the opinion that the argument stating his classification by the Board was improper and at least required prompt and unequivocal rulings sustaining the objection and directing the jury to disregard the argument. Counsel should neither urge, nor draw inferences from matters not in evidence.

The judgment should be reversed, and the cause remanded.

It is so ordered.

LOZIER and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.