Everett W. RUSSELL, Plaintiff-Respondent,

v.

GULF, MOBILE AND OHIO RAILROAD COMPANY, a Corporation, Defendant-Appellant.

No. 50936.

Supreme Court of Missouri, Division No. 2.

Dec. 13, 1965.

Motion for Rehearing and to Transfer to Court En Banc Denied Jan. 10, 1966.

Gray & Sommers, Charles E. Gray, St. Louis, for plaintiff-respondent.

Fordyce, Mayne, Hartman, Renard & Stribling, Alphonso H. Voorhees, Robert T. Johnson, St. Louis, for (defendant) appellant.

BARRETT, Commissioner.

In this action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., Everett W. Russell, a carman's helper—called an oiler and brasser, has recovered a judgment for $45,000 against his employer, the Gulf, Mobile and Ohio Railroad Company.

The most direct route to the essence of this appeal and to the facts necessary to its disposition is to first set forth the appellant-railroad's principal complaints. Upon the merits of the cause of action the appellant has briefed three separate points, one that its motions for judgment should have been sustained and, two and three, that the court prejudicially erred in giving Instructions 1 and 2, but in their essence these three separately briefed points are but different ways of contending that for one reason or another the respondent Russell did not make a case under the Federal Employers' Liability Act. To present and consider each of these points in the detail suggested by the appellant would require the reproduction of the entire record, but setting forth its principal arguments dispenses with the necessity of detailed analysis and demonstration.

In urging that its motions for judgment should have been sustained the appellant GM&O contends, in part, that there is no proof that the violent jerk and coupling to the car under which Russell was working "was caused by the negligence of defendant or any agent or servant of defendant or by any instrumentality operated or controlled by defendant." This same point is presented in its argument with respect to Instructions 2 and 3. It is said that Instruction 1 erroneously fails to require a finding that the cars shoved and on which plaintiff was working were moved by "defendant or by anyone acting for or on behalf of defendant" but erroneously assumes that they were "in fact moved by the defendant." Or, as to Instruction 2, it is said that the instruction fails to hypothesize sufficient facts "upon which to base a conclusion that Terminal was acting as GM&O's agent *at the moment of the accident.*" (Emphasis supplied.) In fact, appellant says, Terminal was not performing services for defendant but rather "was moving cars into a train of another railroad." In its reply brief appellant asserts that upon this transcript Terminal in making up a B&O train was not "furthering the operational activities of the defendant" and was not the agent of GM&O at the time of the accident and again it is repeated that there is no evidence to support the hypothesis that "defendant moved the train" or that if Terminal moved the B&O train it was doing so for defendant or its agent.

In view of the pleadings, the admissions or the tacitly conceded and tried issues, this phase of the appellant's argument is

indeed technical if not factitious. By its answer the defendant admitted that it was engaged in interstate commerce and that on September 15, 1962, Russell was employed by it as a carman's helper in its 21st Street yards and that his duties were in furtherance of interstate commerce. In its admissions GM&O admitted that it had an agreement with Terminal to move railroad cars into its 21st Street yards and as to plaintiff Russell's duties to oil cars in the 21st Street yards there was the equivocal answer "Partially." In any event, on September 15, 1962, Russell was on the 3 p. m. to 11 shift and while he was employed by the appellant GM&O it was his duty to assist in oiling Baltimore & Ohio trains National No. 1 and National No. 2. The train was National No. 1 when it came in on either track 8 or 19 and National No. 2 when it was subsequently placed on track 15 and in GM&O's 21st Street yeards to be again made up as an outgoing train. All switching was done by a Terminal switch engine and crew. According to carman Parcus, defendant's witness and Russell's immediate supervisor, there were several movements. After B&O's National was brought in "we cut some cars out, they took the train back to the station, and then came back." Then "they went" to track 12 and picked up two Pullman cars and returned those to track 15 and to GM&O's 21st Street yards, and Parcus "laced the air" thus making at that time a cut or train of seven cars. Parcus rode with the Terminal engine because, while Terminal provided a switchman, it did not provide an airman, that was Parcus' function although he too was a GM&O employee.

It is not necessary to set forth other details and indicate their indubitable inferences, one of the cases cited by appellant may be a sufficient answer to all these related questions. In Sinkler v. Missouri Pacific R. Co., 356 U.S. 326, 78 S.Ct. 758, 2 L.Ed.2d 799, a cook on the private car of Missouri Pacific's general manager was injured when the car was being switched by Belt Railway from one track to another in

the Union Station in Houston and was caused to violently collide with another car. The Texas court reversed a plaintiff's judgment "upon the ground that the FELA did not subject the respondent (Missouri Pacific) to liability for injuries of its employee caused by the fault of employees of the Belt Railway." It is not necessary to quote at length from the Supreme Court's opinion and set forth its rationale, insofar as plainly applicable here the court said, "the respondent, rather than doing the necessary switching incident to its business in the Houston Terminal area, arranged that the Belt Railway should supply the crews and equipment to perform this operation on its behalf. But the evidence clearly establishes that the respondent's trains, when under the control of the Belt Railway's switching crews, were being handled to further the task of the respondent's enterprise. While engaged in switching and handling respondent's cars and trains about the terminal area, the Belt Railway employees on the job were, for purposes of the FELA, as much a part of the respondent's total enterprise as was the petitioner while engaged in his regular work on the respondent's car."

It is suggested since Russell was working on a B&O train pushed and jolted by a Terminal switch engine that the case is not governed by the Sinkler case because these were not "operational activities" of defendant GM&O. But indisputably, even though National No. 1 and 2 were B&O trains and Russell was a GM&O employee, the collision and injury were in GM&O's 21st Street yards and it was admittedly Russell's duty to oil those trains. But if the analogy is not sufficient, in Shenker v. Baltimore & Ohio R. Co., 374 U.S. 1, 83 S.Ct. 1667, 10 L.Ed.2d 709, plaintiff, a B&O employee, paid by B&O and under the sole supervision of B&O employees, was injured when he attempted to slide or open a defective door on a Pittsburgh & Lake Erie Railroad car. It is not necessary to detail the circumstances as they are fully set forth in the opinion in

that case but the court held that Shenker was a B&O employee and that B&O owed him the nondelegable duty to furnish him a safe place in which to work, including even a duty to inspect P&LE cars before sending its employees into them. Plainly applicable to appellant's present contention: "The B&O required the petitioner to work with cars belonging to P&LE, taking no precautions whatsoever to protect him from possible defects in these cars, defects for which it would be liable should they appear in its own cars. * * * Nor is it an answer to claim that B&O lacked control or supervision over the P&LE car. Such arguments have never supported an exception to the employer's duty to provide a safe place to work * * *." In Payne v. Baltimore and O. R. Co., 6 Cir., 309 F.2d 546 (certiorari denied 374 U.S. 827, 83 S.Ct. 1865, 10 L.Ed.2d 1051), a B&O switchman was injured when a car from a B&O train was derailed on a private spur due to an accumulation of spilled ash. Applicable not only to instructions, including as here a paragraph on the duty to furnish a safe place to work, but as to substantive law the court said: "* * * there are two tests by either of which the charge of the District Judge was proper. One test is that involving the duty of a railroad in the area of its own action or failure of action. The other test is the more encompassing one involving responsibility for the safety of a place where its employees are required to work. This latter calls into play the doctrine of imputable negligence which we view as being within the purview of the FELA. * * * Under FELA the employer is the one owing the duty to the employee. The employee need not look elsewhere for his protection. He has a right under FELA to rely on his employer and none other. When the employer delegates its duty, or abdicates its control, the employer takes the risk, not the employee."

■ Five or six of the appellant's contentions have to do with its substantive liability and this is presented in several different ways. It is that its motions for judgment should have been sustained because the plaintiff, a railroad employee "who was injured when a railroad car under which he was working was caused to move," by his own evidence "has shown that the injury did not result from any negligence on the part of the defendant." It is said that plaintiff testified that he was prohibited from doing work which took him underneath a train until the train was made up and yet he said that the train was not made up and that he had made no effort to determine whether the train was made up and in fact had been advised that additional cars were to be added. As to the instructions it is said that there was no evidence to support the hypothesis that the appellant knew or should have known that plaintiff was oiling a gear box and was likely to be in a position where the movement of a car would result in his injury. Those arguments are expanded in its reply brief and it is said that "safe place to work" is beside the point and is but an attempt to evade the thrust of "sole cause"— meaning that "(e)very single action or admission leading to the plaintiff's injuries can be traced solely to the plaintiff himself. As demonstrated, the defendant was guilty of no negligence at all and can not be liable here as a matter of law."

But as stated in the beginning, as assistant carman it was Russell's duty to oil the B&O's trains, National No. 1 and National No. 2. And so, as was his duty, as soon as B&O train No. 1 came in Russell immediately started oiling the cars, particularly the gears and journals. As was often the case he could not finish the job of oiling before the train was to be moved to the 21st Street yards and again made up as outgoing National No. 2 and so, while the train was being moved, he ate supper and then proceeded over to GM&O's 21st Street station and continued his task of oiling the train. In describing the situation he said, "I was sitting on a rail with my back against the generator and with my left arm (flashlight in right hand) reached over to oil the generator gear box. * * *

Unbeknownst to me I was knocked to my side to where I fell over on the side after I was knocked, and I couldn't get up for a while." He said that he did not look at the "head end" of the train to see whether there was an RPO car (railway post office car) there which would indicate a train made up. He said that he did not ask anyone whether any cars were to be added because "They always come around and tell you but no one told me that night. * * * Sure, you will have to know when it is made up. If I didn't know it, they tell you. You have to know it. * * * Our boss always says stay out from under cars until the train is made up, so that night I stayed out from under the car until I had eaten my supper, and I stayed out from under the cars, and the brakeman and switchman always come around and investigate the car to see if there is anybody under the train. None of my workmen, neither my switchman or brakeman came around to notify me that night." He knew about the blue flag rule but "I was always warned, when I went to my boss he told me 'don't never get under the train until they are done switching,' and, therefore, we was never to use the flag, never at any time * * *." As to whether plaintiff Russell worked on "a set schedule" there were these questions and answers *on cross-examination*: "Q. Your work is pretty much the same from one day to the other on that shift, isn't it? A. Yes, sir. Q. The same train comes in and the same train goes out? A. Correct. Q. And you got to get the same train, which is B&O No. 2, or what comes in as B&O No. 1? A. Correct. Q. You have to oil the journal boxes on that train? A. Correct. Q. You have to oil the gear boxes? A. Correct. * * * Q. And from day to day you saw this train come in * * * (and) you worked on the cars of the train that came in and you worked on the cars of the train that's going out? A. Correct. Q. Don't you get pretty much accustomed to knowing what cars are going to be in that train? A. Yes." And finally as to the movement causing the injury, on cross-

examination, "Q. Was there a jar that this train made when you were under it any different than another switching of cars in on it? Was it any different? A. Yes, sir, it was. Q. And how? A. Greater knock, or jar, or whatever you want to call it."

The appellant recognizes and yet in part attempts to avoid the rule laid down in what has come to be the leading case, Rogers v. Missouri Pacific R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493, "Under this statute (FELA) the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought." See also the language of the statutes 45 U.S.C.A. §§ 51, 53 and 54 and the annotation in 4 L.Ed.2d 1787 "Supreme Court review of sufficiency of evidence in actions under Federal Employers' Liability Act." Insofar as the appellant's "sole cause" and "no negligence at all" arguments appear to be but another way of urging "assumption of risk" as a defense, it ignores the force of Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610. In that case it was the duty of the railroad's policeman to inspect the seals on cars and while standing between two tracks at night inspecting the seals on one train he was hit and killed by a train backing in the opposite direction. He was of course familiar with prior instructions to watch out for the movement of trains as no one looked out for him and there were no lights. Somewhat as the appellant urges here, a circuit court of appeals "distinguished between assumption of risk as a defense by employers against the consequence of their own negligence, and assumption of risk as negating any conclusion that negligence existed at all." But the Supreme Court said, "We hold that every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 amendment, and that Congress, by abolishing the defense of assumption of risk in that statute, did not mean to leave open

the identical defense for the master by changing its name to 'non-negligence'". A much weaker case on its facts was Seaboard Air Line R. Co. v. Strickland, (Fla.) 80 So.2d 914, in which an employee was injured as he and others were changing an outside brake beam. "The plaintiff, while in a squatting or stooping position, and in the process of disengaging the beam from the belts, slipped and fell back against a switch box which was a permanent fixture extending down from the floor of the car, injuring his back." (80 So.2d l. c. 916). There was proof of a custom to change outside brake beams at a safer place— on a flat track or in a pit where there was lighting and a better footing. The Florida court held that on these facts there was no proof of an unsafe place to work and hence no negligence and therefore reversed a plaintiff's judgment. But in a true *"Per Curiam"* opinion the Supreme Court granted certiorari and reversed the judgment of the Florida Court. Strickland v. Seaboard Air Line R. Co., 350 U.S. 893, 76 S.Ct. 157, 100 L.Ed. 786. And as to the evidence as to custom and warning see Goodwin v. Missouri Pacific R. Co., 335 Mo. 398, 399, 72 S.W.2d 988, and Grosvener v. New York Central R. Co., 343 Mo. 611, 123 S.W.2d 173.

The first two sentences in Instruction 1 abstractly instructed the jury on negligence and the duty of GM&O to "provide its employees with a reasonably safe place within which to do their work and failure to use such care is negligence." As indicated, the appellant's contention in the trial of the case may have necessitated this abstraction. Terminal R. Ass'n of St. Louis v. Fitzjohn, 8 Cir., 165 F.2d 473, 1 A.L.R.2d 290. While it does say that failure to provide a safe place to work is "negligence," a verdict for the plaintiff is not directed upon this hypothesis. Immediately following in the same instruction the plaintiff's position, duty and all relevant circumstances were set out and the defendant's liability was hypothesized upon a finding that in moving the cars "defendant failed and omitted to give plaintiff any warning of such anticipated move." In these circumstances the introductory sentences of Instruction 1 may not be said to be so confusing to the jury as to demand the granting of a new trial. Winters v. Terminal R. Ass'n of St. Louis, 363 Mo. 606, 252 S. W.2d 380, 387.

Instruction 7 was a so-called, long-form, five-part instruction on the measure of damages and it is claimed that it was prejudicially erroneous in that there was no requirement that subparts 4 and 5, impairment of ability to work in the future and "nature, character and extent of said injuries," were "the direct result of the injuries allegedly sustained by plaintiff." In part the appellant urges that there was no requirement of a finding that the impairment of ability to work was caused "by the alleged injury to plaintiff's back" and second, there was no requirement "that the jury establish any causal link with the alleged injury before they may consider these elements of damages." Mr. Russell had been involved in one or more prior accidents and injuries over the years for which he had made claim or brought suit. Then too in 1963, largely because of "bilateral mixed type deafness with perception deafness dominating" (Russell called it "crickets in his ear") he was retired from railroad service with retirement benefits of $102 a month. In its only cited case, O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S.W. 55, the appellant suggests that there is a striking "parallel" with this case. It is not necessary, however, to point out the distinguishing characteristics of the two cases, the damage instructions, as with all instructions, are read together (Layton v. Palmer, Mo., 309 S.W.2d 561, 570, 66 A.L. R.2d 1242) and the appellant's only offered delimiting instruction, Number 8, was given and that instruction told the jurors that they "must not allow the plaintiff any damages for loss of wages after the date said hearing defect * * * would have caused him to stop working." Feste v. Newman, Mo.App., 389 S.W.2d 369, 372.

As a matter of fact the essentially meritorious problem is whether upon this record the verdict of $45,000 is so excessive as to demand a remittitur. The jury originally returned a verdict for $48,000 but inasmuch as only $45,000 damages was prayed the plaintiff remitted $3,000. In addition to his own testimony as to his injuries, treatment, losses and pains, there were two medical witnesses, a chiropractor and a doctor of medicine. Essentially there was no difference in the testimony of these two practitioners of the healing arts and a brief summary of the testimony of Dr. Walters will suffice for the purposes of this opinion. Mr. Russell suffered no broken bones or other visible signs of injury and Dr. Walters found "no muscle spasm" and for his age of 61 no deformities other than some arthritic changes. He found a "tenderness over the muscle areas on either side of the lumbar vertebrae." Pointing to X rays the doctor said, "there is an arthritic spur on the third lumbar vertebra * * *. The other abnormality that I note is with last or the fifth lumbar vertebra and the sacrum, which is this bone here, was some narrowing here, and I observe an irregularity of this junction." In answer to the principal hypothetical question the doctor said, *"It would be my opinion that this man sustained soft tissue or muscle injuries in that region of his back. * * ** this man had injuries to the muscles of his back from which he is still complaining, the type of injury that takes place when something of this type or condition results in the tearing or the straining of muscles, and ligaments, * * **." He was of the opinion that Russell's arthritis "wouldn't be involved" and neither would his prior injuries, especially the fractured clavicle of 1956. As to prognosis and permanency the doctor concluded, "I believe that if he had complaints of that duration, which is over a year, it would be my opinion that the complaints and the injuries we mentioned would be of a permanent nature."

In addition to his physical injuries the respondent, using certain formulas, projects a loss of earnings and decreased benefits approximating $21,000. He was finally hospitalized for treatment from November 23 to December 20, 1962. Mr. Russell complains of aches and soreness in his back but essentially *"this man sustained soft tissue or muscle injuries in that region of his back."* In short, applying Missouri's time-honored doctrine of some uniformity of verdicts for comparable injuries, embracing all the usual tests including, even since 1958, the continued diminishing value of the dollar, this verdict is manifestly excessive in the sum of $20,000. Kiger v. Terminal Railroad Ass'n of St. Louis, Mo., 311 S. W.2d 5, 13–15, Miller v. Multiplex Faucet Co., Mo., 315 S.W.2d 224; Harvey v. Gardner, 359 Mo. 730, 223 S.W.2d 428. Therefore, if the plaintiff-respondent enters a remittitur in the sum of $20,000 within fifteen days the judgment is affirmed in the sum of $25,000 as of the date of the original verdict, otherwise the judgment will be reversed and remanded for a new trial.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

EAGER, P. J., and STORCKMAN, J., concur.

FINCH, J., concurs in the result.