**HUGHES v. TERMINAL R. ASS'N OF ST. LOUIS.**

No. 43221.

Supreme Court of Missouri.
En Banc.

March 8, 1954.

Warner Fuller, George P. Mueller, Arnot L. Sheppard, St. Louis, for appellant.

John H. Haley, Jr., St. Louis, Douglas H. Jones, St. Louis, of counsel, for respondent.

VAN OSDOL, Commissioner.

In this action under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq., plaintiff-administratrix sought recovery for the death of John E. Hughes, who was fatally injured January 20, 1951, while on duty as a switchman in defendant's switch yards. A jury returned a verdict and judgment was rendered for plaintiff in the sum of $30,000. Defendant has appealed.

Defendant-appellant contends the trial court erred in submitting plaintiff's case to the jury. In supporting this contention, defendant asserts plaintiff's evidence established that her decedent alighted from a moving train and, without looking, stepped directly in front of Diesel locomotives moving on an adjacent track, when even a glance would have disclosed the presence and movement of the locomotives; this evidence, defendant-appellant contends, constitutes conclusive proof that the sole proximate cause of the death of plaintiff's decedent was his own negligence. Defendant also says that the theories of specific negligence of defendant as submitted by Instructions Nos. 1, 2, 3, 4 and 5 erroneously postulated the duty of someone to maintain a lookout for deceased, and that the failure so to do was actionable negligence which proximately caused his death. Defendant-appellant further contends plaintiff's Instruction No. 5 erroneously submitted negligence in failing to provide a safe place to work; and further asserts the trial court

erred in refusing to give defendant's requested Instruction No. 4, and in the admission and exclusion of evidence.

Broadly stated, defendant's contentions relating to the submissibility of plaintiff's case are that, absent a rule or special custom requiring such precautions, defendant had no duty to look out for deceased, a switchman, or warn him of the Diesel switching movement, or to ascertain whether or not he was in or was about to go into the pathway of defendant's Diesels; and, even though defendant has such a duty, there was no substantial evidence tending to show that, had defendant's employees been in position to see deceased was in danger or to communicate and receive signals that he was in danger, defendant's employees could have stopped the Diesel locomotives in time to have averted the tragedy. Plaintiff-respondent, on the other hand, contends that, in this action under the Federal Employers' Liability Act, the test of defendant's liability is negligence—the lack of due care under the circumstances; that, under the evidence introduced in the trial of this case, the jury was warranted in inferring that defendant should have anticipated that someone might alight from the train as it was moving northwardly in the switching movement; and that, had defendant's employees been in position to see deceased and effectively give and receive signals indicating deceased's presence and danger, the Diesel engines could have been stopped before deceased was struck by the forward Diesel locomotive.

The contentions of the parties require an extended statement of the evidence introduced, and a careful examination of the theories of specific negligence submitted to the jury by the trial court's instructions.

Plaintiff's decedent was the "headman" of a switching crew operating with a steam locomotive in defendant's yards in Illinois. A few seconds before his fatal injury, he had alighted from a freight car, the fifth car (or sixth or seventh, counting the engine tender) north of the steam engine which was coupled to the south end of a "cut" or train of forty-three cars. The

train was being backed northwardly in a switching movement (curving northeastwardly) by which it was intended to move and set thirty cars of the forty-three-car train on a track, No. 81, the remaining thirteen cars to be retained and moved again southwardly and then again more northeastwardly into the Kettle River Yards.

In the switching movement, plaintiff's decedent had the duty of relaying signals to the engineer of the steam engine—such signals as were to have been passed on to him by McCrackin, the "rearman" of the switching crew, who was farther north on the west side of the train, and which signals were such as might have been given by the foreman who was still farther to the north-ward and was superintending the movement and watching the north end of the train "curve in" northeastwardly on Track 81. Plaintiff's decedent had the duty to alight from the train and to relay signals. It was usual for him to alight where he did at a point near a switch, which switch would have governed a subsequent southward movement preliminary to the movement of the thirteen cars into the Kettle River Yards. "He was supposed to stay at that switch" until these movements were completed. He "had to watch McCrackin on this move." Deceased had been a member of the crew for about a year and a half. It was a move which had been made every day for "about the last ten years."

Just before plaintiff's decedent alighted from the west side of the train, defendant's Diesel engines Nos. 589 and 590 were moving northeastwardly, over a "slip" or "pipeline" switch, toward and onto a north-south track adjacent to and west of the track on which the forty-three-car train was moving. The northward movement of the forty-three-car train on the east track was a "regular" movement; the northward movement on the west track was an "irregular" movement; both tracks are used in both directions; but "you got to get orders when you go irregular * * *." In the northbound movement of the Diesels, Diesel engine No. 589 was the leading engine, headed northwardly; Diesel engine

No. 590 was the trailing engine, headed southwardly. Coupled "cab to cab", the two Diesels were operated as a unit by the engineer Heinz who was seated in the cab on the right (west) side of the trailing Diesel engine No. 590.

When plaintiff's decedent alighted from the freight car, he did not see the approaching Diesels and stepped in front of the leading Diesel engine No. 589. He was struck by the front footboard; was thrown to the ground; and the right front wheel of the forward truck of the locomotive passed over his body fatally injuring him. As stated, when defendant's Diesel engines were moving northeastwardly over the "slip" and onto the north-south track adjacent and to the westward of the track on which the forty-three-car train was moving, the engineer was operating the Diesel engines from the west (right) side of the cab of the trailing Diesel engine No. 590. [There was evidence introduced tending to show that, in a northward movement, the engineer's view of objects at the east rail of the track to the northward is obstructed for a distance of 237 feet when the Diesels are being operated by an engineer seated on the right (west) side of the cab of the trailing engine.] One Whitson, the "headman" of the switching crew operating in connection with the Diesel engines, was standing on the "catwalk" on the right of the radiator grill of Diesel engine No. 589.

He had taken this position of shelter from the cold (January) wind blowing from the northwest. His normal position would have been such that he could have communicated signals to the engineer; and, the engineer being on the west side of the trailing locomotive, Whitson normally would have been on the west side of the forward end of Diesel engine No. 589. The firemen, whose position is normally on the left side of the cab of an engine, was consequently on the east side of the cab of engine No. 590. The fireman was not looking northwardly; he was attempting to open the side window of the cab of engine No. 590.

As the leading Diesel engine was "coming through the slip" onto the track adjacent to and west of the track on which the forty-three-car switching movement was being made, Whitson, from his position on the catwalk to the right of the radiator grill on the east side of the leading Diesel engine, saw plaintiff's decedent, John E. Hughes, standing in the stirrup and holding onto the grab iron of the fifth car north of the steam engine. Whitson testified that the forty-three-car train was moving faster than the Diesels. "Jack Hughes was just going ahead of me, north of me. * * * I hollered, 'watch him.'" Hughes did not hear. Hughes got off "up further," right north of a point opposite a switch stand, west of the west track. He got off sixty to eighty feet north of the front of Diesel No. 589. The leading engine (No. 589) was then "approximately on the straight track." The Diesels were moving five to seven miles per hour, "something in the neighborhood." When deceased got off, "I immediately gave a wash-out on the fireman's side (east side) * * * No response." Whitson went around the head end of the engine "and gave it (the wash-out) to the engineer. * * * The engine stopped." Deceased had walked in a northwesterly direction. "About the third or fourth step * * * a footboard hit him." Whitson also said, "Well, when I was over on that side he got hit in the leg, shoulder, and down."

As the "cut" or train of forty-three cars was being pushed northwardly by the steam engine, the engineer of the steam engine, O'Sullivan, was watching deceased. The engineer, who was a witness for defendant, knew the Diesels were in the vicinity. After deceased had stepped from the train, he walked on a "northwest angle." He "made three steps until he got out of my (the engineer's) sight." It was about two seconds "until he disappeared." The engineer realized deceased might be struck by the Diesels, but the engineer did not pull the whistle cord. He explained, "I didn't have time." [Had he sounded the whistle continuously, it would have constituted a signal for all engines or trains, including the Diesels, to "stop and not proceed until safety is assured." Rule 14(u), infra.]

There was substantial evidence tending to show that no whistle or bell or horn of any locomotive was sounded.

Defendant's Operating and Safety Rules were introduced into evidence as follows— Rule 31, "The engine-whistle must be sounded at all places where required by rule or law, and to avoid accidents"; Rule 34, "The engineman and fireman must, when practicable, communicate to each other by its name the indication of all signals affecting the movement of their train"; Rule 57, employees, when about to board or alight from moving cars or engines, must "look out for trains operating on adjacent tracks * * *"; Rule 101, "In foggy or stormy weather which obstructs the view; also when the view is otherwise obstructed, enginemen and trainmen must be specially alert, and trains must be moved under such control as to insure stopping within distance track is known to be clear * * *"; Rule 705, fireman must "assist the engineman in watching for signals * * *"; Rule 87, "Be on the alert when moving around curves or where clearances are close and around station platforms"; Rule 14(u), providing that engine and motor whistle signals shall be "continuously" sounded—"Used by one engine to stop another to avoid accident. When sounded all engines or trains in vicinity must stop and not proceed until safety is assured."

█ It is assumed that deceased was negligent in alighting from the freight car and stepping over into the pathway of defendant's engines, but it should not be said that deceased's negligence was, as a matter of law, the sole cause of the fatal injury if the evidence supports the reasonable inference that defendant was negligent and that such negligence was "in whole or in part" a cause of the casualty. Since the Amendment of the Federal Employer's Liability Act in 1939, 45 U.S.C.A. § 54, it is not to be held that a defendant railroad has no duty in all circumstances to exercise due care in taking precautions to protect its employees-switchmen from danger. The question in a given case is—did the defendant, in given circumstances, take precautions commensurate with the dangers likely to be encountered? In this action under the Federal Employers' Liability Act, it is the duty of this court to apply the test of liability under the Act as has been laid down by the Supreme Court of the United States. The test of liability under the Act is *negligence*, which that court has defined "as the lack of due care under the circumstances; or the failure to do what a reasonable and prudent man would ordinarily have done under the circumstances of the situation; or doing what such a person under the existing circumstances would not have done." Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54 at page 67, 63 S.Ct. 444 at page 451, 87 L.Ed. 610; Luthy v. Terminal R. Ass'n of St. Louis, Mo.Sup., 243 S.W.2d 332; Winters v. Terminal R. Ass'n of St. Louis, 363 Mo. 606, 252 S.W.2d 380. As we understand the Tiller case, it was there held that the rule of Toledo, St. L. & W. R. Co. v. Allen, 276 U.S. 165, 48 S.Ct. 215, 72 L.Ed. 513, and of many other cases, "namely, that in the absence of special custom or unusual circumstances, a man who is run over by a switching movement cannot recover", no longer is to be followed. In cases where an injury resulted in whole or in part from negligence of defendant, the Amendment of 1939 abolished every vestige of the doctrine of assumption of risk regardless of whether by reason of the defense of assumption of risk "the same result is reached by assigning a given case to one of three practically interchangeable categories: (a) the employee assumed the risk; (b) he was guilty of contributory negligence; (c) the master was not negligent." 318 U.S. at page 58, 63 S.Ct. at page 446.

█ Now again attending the facts and circumstances shown in evidence in the case at bar—the Diesels approached from the southwest, crossing over into the west north-south track at an angle at a point south of the switch stand where it was usual for switchmen to drop off, as deceased did, to relay signals and govern subsequent movements in switching operations. The switching movement was like those that had been made daily for years

at that place. It seems it could be reasonably said defendant's employees in charge of the Diesel engines should have anticipated that switchmen would alight and take positions to the westward of the east north-south track in executing the switching movement on that track. And it would not be unreasonable to suppose that such switchmen would be preoccupied in correctly executing the switching operation; might not become aware of the irregular and more or less silent movement of the Diesels moving up at an angle from the southwest; and might, because of the narrow clearance between the tracks, be in or come into the pathway of the approaching Diesels. The employees operating the Diesels were not at the time engrossed in executing any complicated switching movement. In the circumstances we think it would not be unreasonable to conclude that, in the exercise of due care, defendant's employees should have been at their posts, watchful and alert, and in position to see, or communicate and receive signals of what they saw in whatever situation obtained in the circumstances of use of the tracks at that place at the time, or to sound a warning of the Diesels' approach. The failure of the switchman on the front of the leading Diesel, and of the fireman and engineer of the Diesels, to be in a position to see, or to be in a position to communicate or receive signals that deceased was in danger, had the effect of making the Diesel engine movement a "blind" one with respect to any operational action which could have been taken to avoid striking plaintiff's decedent.

But it is urged that, even had all of defendant's employees in charge of the Diesels been at appropriate posts, watchful and alert, they could not have seen deceased was in danger in time to have avoided the casualty. In Atlantic Coast Line Railroad Co. v. Driggers, 279 U.S. 787, 49 S.Ct. 490, 73 L.Ed. 521, cited by defendant-appellant, plaintiff's decedent swung from a switch engine and into the side of the engine of a passing passenger train at a time when it was impossible for the engineer to stop the train. In the circumstances stated in the opinion, no negligence of defendant could have been a concurring cause of the casualty. (In the case of Ottley v. St. Louis-San Francisco Ry. Co., 360 Mo. 1189, 232 S.W.2d 966, also cited by defendant-appellant, the plaintiff's case failed because the evidence did not support negligence of defendant as pleaded and submitted.) Under the facts of the instant case, we believe it is not to be correctly held as a matter of law that plaintiff's decedent alighted and passed over northwestwardly and in front of defendant's Diesel locomotives at a time after which defendant's employees could not have stopped the Diesel locomotives and thus avoided striking plaintiff's decedent. When the Diesels were brought to a stop, deceased's body was lying between the front and rear right wheels of the forward truck of Diesel No. 589. It is thirteen feet, two inches from the front of the footboard to the front of the back wheel of the forward truck. It is five feet, two inches from the front of the footboard to the front of the front wheel of the forward truck. It would be reasonable to conclude that, had the Diesels been stopped at a point somewhat less than eight feet farther to the southward, the tragedy would not have occurred. As stated, there was evidence tending to show that when deceased alighted from the freight car he was sixty to eighty feet north of the north end of Diesel No. 589; and that, oblivious of the approach of the locomotives, deceased moved northwestwardly three or four steps and was struck down. The Diesels, moving at a rate of speed of five miles an hour, traversed 7.33 feet per second; at seven miles per hour, 10.26 feet per second. Moving at five miles per hour over a distance of sixty feet would consume about 8.2 seconds, and moving at seven miles per hour, 5.8 seconds; over a distance of eighty feet, moving at five miles per hour, 10.9 seconds, and at seven miles per hour, 7.7 seconds. According to plaintiff's evidence the Diesel engines, moving at five miles per hour, could have been stopped within "about ten or twelve feet"; and "fifteen, sixteen feet, at seven miles an hour." In this connection, defendant-appellant has questioned the probative effect of the testimony of Whitson. We have re--

lied upon the testimony of Whitson in ruling there was substantial evidence that deceased alighted from the freight car at a point sixty or eighty feet north of the leading Diesel engine. It is contended that the testimony of Whitson as to this fact was self-destructive. It is to be remembered that Whitson said, "Well, when I was over on that side he got hit in the leg, shoulder, and down." He also testified, "I hollered, and he walked right directly into our footboard of our engine." Defendant-appellant argues that, when Whitson said, "when I was *over on that side,*" he certainly meant the *east* side (northeast corner) of the engine, and that it follows deceased alighted when the Diesels were very close upon him and when it was impossible to thereafter stop the locomotives and avoid the casualty. But the Diesels moved something less than thirteen feet and two inches after the footboard struck deceased and knocked him down. As we construe his testimony, Whitson was saying that he called a warning, saw deceased alight, gave a futile signal to the fireman, moved to the west side (northwest corner) of the engine, and signaled the engineer who brought the Diesels to a stop; and, since the engines moved only about thirteen feet after deceased was hit, it seems to us that, by the use of the words "that side," Whitson must have meant that he was on the "west" side of the engine when deceased "got hit in the leg, shoulder, and down."

Plaintiff's case was submitted to the jury on five theories of negligence of defendant. Each of the five theories was submitted in a separate instruction, each instruction authorizing a verdict for plaintiff. The effect of the separate submissions was to submit the theories in the disjunctive.

Instruction No. 1 submitted that an employee of defendant (Whitson) was riding on the northeast corner of the leading Diesel at the time John E. Hughes alighted from the railroad car; that in such position a signal by Whitson was not visible to the Diesel engineer, Heinz; that Heinz could not, from the position he was in, see John E. Hughes when he alighted; that Whitson could have then been riding on the west side

at the front of the engines and in such position a signal by him would have been visible to Heinz, "and that such employee of defendant in such position * * * by the exercise of ordinary care could have seen * * * John E. Hughes alight from the railroad car moving on the next track to the east of said diesel engines and move into a position of peril in front of said diesel engines in time to have signaled to the operator of said diesel engines to stop said diesel engines and in time thereafter for the operator of said diesel engines to have, in the exercise of ordinary care and with the means and appliances at hand, stopped said diesel engines before striking John E. Hughes, *and that for such employee of defendant to have been occupying a position on the east side at the front of said diesel engines instead of on the west side at the front thereof was negligence* and that wholly or partly as a direct result thereof, said diesel engines struck and fatally injured John E. Hughes * * *, then your verdict should be in favor of the plaintiff * * *." (Our italics.)

Instruction No. 2 submitted negligent failure of the engineer of the steam locomotive to give "a stop signal to the operator of said diesel engines by continuously sounding the whistle on said steam locomotive."

Instruction No. 3 submitted that, immediately after deceased alighted, he moved into a position of peril in front of the two Diesels, and that the operator, Heinz, of the Diesel engines could have been operating them from a position on the east side of the cab of the leading Diesel and from such position he could have seen deceased alight and move into a position of peril in front of the Diesels in time thereafter to have, "by the exercise of ordinary care and with the means and appliances at hand, stopped said diesel engines before they struck and ran over and fatally injured John E. Hughes and that said diesel engines were being operated from a position on the west side of the cab of the southernmost or rear one of said diesel engines and that in such position the operator thereof could not have seen John E. Hughes alight

from said railroad car as it was moving on the next track to the east of said diesel engines and move into a position of peril in front of the diesel engines in time to have stopped them before striking, running over and fatally injuring John E. Hughes *and that for the diesel engines to have been operated from such position on the west side of the cab of the southernmost or rear one of said diesel engines was negligence* and that wholly or partly as a direct result of such negligence John E. Hughes was fatally injured * * *, then your verdict should be in favor of the plaintiff * *." (Our italics.)

Instruction No. 4 submitted that "if you find and believe from the evidence that as the two diesel engines were moving northwardly at the time and place mentioned in evidence a stop signal was given by an employee of defendant who was riding on the northeast portion of the northernmost of said diesel engines when John E. Hughes alighted from the railroad car which was moving on the next track to the east of said diesel engines and that an employee of defendant was in the cab on the east side of the southernmost of the two diesel engines acting as fireman therein and that such employee saw, or by the exercise of ordinary care could have seen, such stop signal in time to have communicated it to the operator of said diesel engines in time for the operator of said diesel engines in the exercise of ordinary care and with the means and appliances at hand to have stopped said diesel engines before striking and fatally injuring John E. Hughes, *and that defendant's said employee, who was acting as fireman therein, failed to see such stop signal and communicate it to the operator of said diesel engines and that such failure was negligence* and that wholly or partly as a direct result of such negligence John E. Hughes was fatally injured * *, then your verdict should be in favor of the plaintiff * * *." (Our italics.)

And Instruction No. 5 submitted negligent failure of defendant to provide deceased "a reasonably safe place" in which to work, the instruction hypothesizing the narrow (three and one-half feet) clearance between cars moving on the parallel north-south tracks, and "that defendant * * * did not warn" deceased of the approach of the Diesel locomotives.

We have noted there was evidence that Whitson, on the northeast corner of the leading Diesel, and O'Sullivan, engineer of the steam locomotive, saw plaintiff's decedent alight and realized his danger. With respect to Instruction No. 2 submitting the engineer's failure to "continuously" sound the whistle of his steam locomotive, we are of the opinion defendant-appellant's contention that the instruction assumed a duty of defendant to look out could have no significance. Negligence in failing to sound the whistle "continuously," in the circumstance of the engineer's observation of deceased's danger, was supported by the proof of a violation of Operating Rule 14(u), supra. It is not contended that Instruction No. 2 is erroneous in form. But Instruction No. 1 hypothesized negligence of Whitson in being in a position where he could not communicate what he saw to the engineer of the Diesels. So, in regard to Instructions Nos. 1, 3 and 4, we agree with defendant-appellant that the instructions assumed (or in effect authorized a finding) that defendant's employees in the exercise of due care had a duty to take the precaution to look out and to be in a position to see, or to be in a position to communicate and receive signals of what was seen or of what could have been seen, and that these failures could be found to be negligence without requiring a finding, in effect, that, in the circumstances shown in the evidence, a reasonable and prudent man would have ordinarily anticipated or foreseen danger to defendant's employees engaged in the operation so as to impose a duty in the exercise of due care to take the precautionary measure to look out for their safety. There was no rule introduced, or custom shown, requiring defendant's employees to look out for the safety of switchmen working in defendant's yards in any and all circumstances. We cannot say as a matter of law that defendant had such a duty in the circumstances of the instant case. We think it was a jury question, and we agree that the

instructions nowhere or in any way submitted the question to the jury. We recognize that Instructions Nos. 1, 3 and 4 were submissions of primary negligence—acts or omissions antecedent to the time plaintiff's decedent alighted from the train and was in danger (see italicized clauses of Instructions Nos. 1, 3 and 4). For example, see and compare the position of the fireman in the case of Krause v. Pitcairn, 350 Mo. 339, 167 S.W.2d 74, and see the discussion relating to the duty to maintain a lookout in its relation to primary and humanitarian negligence in the case of Mayfield v. Kansas City Southern R. Co., 337 Mo. 79 at pages 90–94, 85 S.W.2d 116 at pages 123–125. See also Lowery v. Kansas City, 337 Mo. 47 at pages 57–58, 85 S.W.2d 104 at page 110, relating to the duty to exercise such care as is required by the circumstances of a case. Yet negligence as submitted in Instructions Nos. 1, 3 and 4 was, as stated, the failure of defendant's employees to see or to be in some other place and in position to communicate or receive signals of what was or could have been seen, all on the hypothesis of what could have been done to have saved deceased *after deceased was in danger.* The three instructions (Nos. 1, 3 and 4) hypothesized that defendant's employees could have averted the casualty if they had seen deceased was in danger, or had been in a position to see and communicate and receive signals that deceased was in danger; but, in submitting negligence in failing to see or negligence in failing to be in a position to communicate and receive signals of what was seen or could have been seen, the drafter of the instructions failed to require the jury to find that such failures constituted negligence in the situation and in the circumstances of the approaching movements of the locomotives and train and the usage of the tracks at the place as shown by the evidence in this case. In other words, antecedent duties were assumed instead of requiring a finding that the circumstances imposed them. None of the three instructions submitted whether the acts or omissions submitted as negligence were negligent because of the shown antecedent circumstances of the use of the tracks at the place, of the approach of the

Diesels, and of the movement and the usual method of handling of such a movement as that of the forty-three-car train at the place. We believe the Instructions Nos. 1, 3 and 4 were prejudicially erroneous.

■ Attending plaintiff's Instruction No. 5—the instruction combined the hypotheses of the facts of the narrow clearance between the two north-south parallel tracks where the Diesels and forty-three-car train were moving; and of defendant's knowledge, actual or constructive, that plaintiff's decedent would alight in the space of narrow clearance. The instruction in the conjunctive further hypothesized the defendant's failure to warn deceased of the approach of the Diesels. Although the instruction submitted negligence in failing to maintain a reasonably safe place to work, the instruction, including the hypotheses of the facts of the operation in relation to the narrow clearance and the failure to warn, submitted facts supported by the evidence which would make out a submissible jury issue of negligence under the decision of Tiller v. Atlantic Coast Line R. Co., supra.

■ Defendant-appellant's refused Instruction No. 4 repetitiously cautioned the jury that "even though you may think of some ground, reason or cause of the injury * * * which has not been mentioned in evidence and which is not mentioned in any of these instructions, you are not permitted to render a verdict * * * on that ground, reason or cause." It was not error to refuse this instruction. Parties are not even entitled to proper cautionary instructions as a matter of right. The giving or refusal of cautionary instructions is largely within the discretion of the trial court. Tatum v. Gulf, M. & O. R. Co., 359 Mo. 709, 223 S.W.2d 418; Arno v. St. Louis Public Service Co., 356 Mo. 584, 202 S.W.2d 787; Morris v. E. I. Du Pont De Nemours & Co., 351 Mo. 479, 173 S.W.2d 39.

Defendant-appellant, as stated, contends the trial court erred in the admission and exclusion of evidence, some of which contentions were urged and decided by this

court in the recent case of Dempsey v. Thompson, Mo.Sup., 251 S.W.2d 42. Since the cause is to be remanded, the further contentions of error in the admission and exclusion of evidence which are unanswered in this opinion may be examined by counsel and the errors, if any be apparent, may be avoided in the event of a retrial.

The judgment should be reversed, and the cause remanded.

It is so ordered.

LOZIER and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

HOLLINGSWORTH, DALTON, JJ., and HYDE, P. J., concur.

CONKLING, J., dissents.

CONKLING, Judge.

I respectfully dissent from the conclusion of the principal opinion that upon this evidence a submissible case was made for the jury. I would reverse the judgment without remanding.

From my consideration of the evidence before us in this Transcript of Record I believe that it does not appear that there is any reasonable inference of proximate cause between any theory of liability advanced by plaintiff and the death of plaintiff's decedent. I think that to rule that plaintiff made a case for the jury upon any theory it would be required that we substitute speculation for any possible reasonable inference.

This Court has many times ruled that speculation cannot fill the office of proof, and that a judgment may not be based upon conjecture. I would reverse the judgment but not remand the cause.

Adopted as the opinion of the court en banc.

ELLISON, HYDE, HOLLINGSWORTH, DALTON and TIPTON, JJ., concur.

CONKLING, C. J., dissents in separate opinion filed.

LEEDY, J., dissents and concurs in dissenting opinion of CONKLING, J.