Irene D. HUGHES, Administratrix of the Estate of John E. Hughes, Deceased, Respondent,

v.

TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.

No. 44702.

Supreme Court of Missouri.

En Banc.

Dec. 10, 1956.

· Warner Fuller, Arnot L. Sheppard, St. Louis, for (defendant) appellant.

Haley, Fredrickson & Caruthers, Rexford H. Caruthers, Robert Gilcrest, St. Louis, for (plaintiff) respondent.

WESTHUES, Judge.

This case comes to the writer on reassignment. It is a suit by plaintiff, Irene D. Hughes, administratrix of the estate of John E. Hughes, deceased, against the Terminal Railroad Association of St. Louis, a corporation, to recover damages for the death of her husband. The action was based on the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. Hughes lost his life while on duty as a switchman in the yards at Madison, Illinois, where a diesel engine ran over him. This is the second appeal. At the first trial, plaintiff obtained a verdict in the sum of $30,000. The case was remanded for retrial because of error in plaintiff's requested instructions. See 265 S.W.2d 273. On retrial, there was a jury verdict for plaintiff for $55,000. From the judgment entered, the defendant appealed.

Defendant has briefed nine principal points, some of which are subdivided into many subsections. All are devoted to the merits of the case except two. One of these pertains to the qualification of jurors and in the other, it is claimed that the verdict is excessive. Defendant, in its points on the merits, has raised some questions that were briefed on the first appeal. The

points presented may be reduced to a few fundamental questions of law. Summarized, they are, as defendant claims: That the enginemen in control of the locomotives do not owe switchmen any duty "in the absence of a rule, custom or usage which created such a duty upon these enginemen." That the evidence was insufficient to sustain a finding that the enginemen were negligent. That the negligence of the deceased Hughes was the proximate cause of his death and the negligence of the enginemen, if any, was not a contributory cause. That no evidence was introduced of any rule, custom or usage imposing on enginemen the duty to be on the lookout for switchmen. Defendant says that the law, as declared in the former opinion, should not be followed. Numerous objections to instructions given by the court were briefed. Most of these involve the same questions abovementioned. A number of other points were briefed and we shall dispose of these in the course of the opinion. Because of defendant's insistence that no case was made for a jury, we shall make a rather extended statement of the case. For a further detailed account, see the opinion on the first appeal. The evidence at the second trial was substantially the same as on the first trial.

The principal facts and circumstances as shown by the evidence were as follows: The accident in question occurred at about 9:30 o'clock on the morning of January 20, 1951, in the Madison, Illinois, yards south of the McKinley Bridge. The tracks ran in a northerly and southerly direction. There were two main line tracks referred to as lead tracks. The one on the west was designated as the eastbound track and the other lying immediately to the east was designated as the westbound track. These tracks were also used in switching movements made in the yards. Numerous tracks branched off these two main line tracks in a northeasterly direction. About 125 feet to the south of the point where tracks begin to branch off to the northeast from the main line tracks, a track designated as the I. C. main line crossed the main line tracks in a northeast and southwest direction. A short distance to the west of the point where this I. C. track crossed the main line tracks, there was a track leading off the I. C. and connecting with the west main track to the north so that cars could be moved from the I. C. track onto the west main track. This connection was referred to in the evidence as a slip. About 90 feet to the north of the point where this slip connected with the main west track, there was a switch on the east track which was the first switch north of the I. C. tracks. By this switch, trains, cars, or engines could be led off the east main track onto a track leading to the northeast to tracks designated as the Kettle River tracks. The space between the main line tracks was such that when both tracks were occupied by cars, the space between the cars on the two tracks was estimated to be about 3 feet or so. The movements of the locomotives and trains immediately before and at the time Hughes met his death were as follows: The crew of which Hughes was a member was making a switching movement that was made daily and at about the same time of day. The crew was moving a train of 43 cars northward on the main track located to the east. A steam locomotive was pushing these cars north for the purpose of leaving 30 cars on track 81 which branched off the main track some distance to the north. The train was then to move back south past the switch above-mentioned where Hughes was to throw the switch so that the other cars could be pushed northeast to the Kettle River tracks. While this train was moving north to place the 30 cars on track 81, it was moving about 10 miles per hour. Hughes was head switchman which placed him near the engine. He was standing in the stirrup on the west side of the fifth car from the engine. His duty was to get off at the first switch to take signals from the rear switchman or brakeman and to relay them to the engineer. The cars on the north end were moving in a northeasterly direction onto track 81 and therefore it was impossible for

the rear switchman to signal the engineer directly. As the fifth car passed the switch, Hughes alighted from the car, walked in a northwesterly direction and after taking a few steps, he was run over by a double-unit diesel or "twins" going north on the west main track. It was a bitter cold day with a strong wind blowing from the northwest. At this time the double-unit diesel was coming off the I. C. main track over the slip onto the west main track and going north at a speed from 5 to 7 m. p. h. Whether plaintiff's evidence justified a verdict in her favor depends on what occurred immediately prior to and at the time Hughes was run over by the lead diesel. Plaintiff's case was submitted to a jury on charges of negligence on the part of the crew operating the diesels and also negligence on the part of the engineer of the steam locomotive which was pushing the 43 cars northward. The diesels involved were numbered 590 and 589. They were coupled "cab to cab"; the engineer Heinz operating the double unit northeastward from the rear diesel which was headed south and therefore he was on the west side of No. 590. One Whitson was the head switchman of the diesel crew and was stationed on the northeast end of the lead diesel, No. 589; the fireman was on the east side of No. 590. Whitson testified that he had taken the northeast position to protect himself from the northwest cold wind. He said he saw Hughes riding alongside on one of the cars of the train moving north on the adjoining track. There is sharp conflict in the evidence as to the distance between the lead diesel and Hughes at the time he stepped off the train on the main east track. We shall disregard the evidence as to the distance as estimated by the witnesses and look to the evidence of Whitson concerning what he did after he discovered Hughes was getting off the car apparently oblivious of the oncoming diesels. The following are excerpts from the evidence of Mr. Whitson:

"Q. There is a slip between the regular route and the I. C. main and between the eastbound—what has been marked the eastbound main and the Illinois Central main line? A. Yes.

"Q. As you were moving north there what straight track did you finally get up on? A. The westbound, irregular.

"Q. Westbound, irregular. Did you notice a freight train on either of those north tracks as you were moving through there? A. I did.

"Q. Which track was it moving on? A. On the eastbound.

"Q. On the eastbound. Is that the track shown in black on this picture? A. Yes.

"Q. All right. As you went through there did you see a man that you later learned was Jack Hughes on a car moving in that vicinity? A. I did.

"Q. Where was he when you saw him, if you can tell us, with reference to any place on the ground? A. On the ground or on the car, now?

"Q. Where was he—first, where was he with reference to the train? A. He was going a little north of the I. C. crossing.

"Q. Going a little north of the I. C. crossing? A. That's right.

"Q. What car was he on on the train? A. The fifth head car.

"Q. When you say the 'fifth head car' what do you mean by that? A. Five cars from the engine.

* * * * * *

"Q. Hughes was in this I. C. crossing here? A. That's right; he was north of us.

"Q. North of you. Can you estimate this distance, with any degree of accuracy, between you and him? A. No, I can't really estimate, except it wasn't a far distance.

"Q. Wasn't a far distance? A. No, sir.

"Q. When you saw him at that place what did you do? A. I hollered, 'watch 'em.'

"Q. What did he do? A. No response.

"Q. How was he dressed that day? A. Well, he had on a mackinaw or pea jacket, they call it, with a collar on.

"Q. Was the collar up or down? A. The collar was up.

"Q. You hollered, 'watch it' at him? Is that all you said? A. 'Watch 'em.'

"Q. Which direction was he facing? A. He was looking north.

"Q. North towards the train. Did he ever turn his head to you? A. I never seen his face.

"Q. Could you see his back? A. Yes, that's right.

"Q. Did the Diesels continue to move on through the slip north? A. They did.

"Q. Did the train Jack Hughes was on continue to move on north? A. He continued to move north.

\* \* \* \* \* \*

"Q. And did you continue to watch Mr. Hughes as he moved north and you moved north? A. I did.

"Q. What did you observe next after that? A. Mr. Hughes continued on north ahead of us and as he got up there a ways, I seen him release one hand as if to go in his pocket for a cigarette or a match or a handkerchief—what he did it for, I do not know.

"Q. All right. And then did he later get off the train? A. He did.

"Q. And where were your engines, the engines you were on, at the time he got off? A. The 589 engine was out of the slip on the straight track.

\* \* \* \* \* \*

"Q. What did you do at that time? A. As he come out—you want from the slip on?

"Q. No. At the time Mr. Hughes got off when your engine was about an engine length north of the switch? A. I give a washout on the east side, the fireman's side of the train; several washouts.

"Q. What is a washout? A. That is an emergency stop sign.

\* \* \* \* \* \*

"Q. You gave these washouts, did you? A. I did.

"Q. What happened then? A. No response.

"Q. And then what did you do? A. Then I went over the front end of the engine, the running board, and give it on the west side, on the right side of the engine.

"Q. Did you notice, did you see what Jack Hughes did after he alighted from the car, on the ground? A. He walked in a northwesterly direction towards the westbound main line.

\* \* \* \* \* \*

"Q. Where were you on the engine when you gave the stop sign to the engineer? A. On the northwest corner.

"Q. Which running board were you on? A. Well, I was on the running board alongside the engine.

"Q. Is that the same running board on the other side of the engine that you had been on? A. The reverse side.

"Q. The reverse. What happened when you gave the stop sign, the washout, then? A. The engineer took my signal and stopped.

"Q. Did you see Jack Hughes after you gave those stop signs? A. I did.

"Q. And where was he when you saw him? A. He was hit by the engine.

"Q. Which side of the engine? A. The west—the east side of the engine.

"Q. What happened to him then? A. He got hit in the legs, knocked down and run over.

\* \* \* \* \* \*

"Q. What did you do? What happened to the freight train, the freight cars that were moving on the other track? A. They had practically stopped."

The fireman, Ralph Low, testified that he was on the east side of the rear diesel engine and at no time saw Whitson give any signals. In fact, he said that he did not see Whitson. It was in evidence that it was a part of Whitson's duties to be on the lookout ahead and to signal if danger appeared and that it was the fireman's duty to relay these signals to Heinz, the engineer, who was operating the diesels. Note the evidence of Heinz concerning the fireman's duties. He was a witness for defendant.

"Q. Now, as you came through this slip, this curve, going onto the eastbound main, going north into the yard, you had a fireman with you? A. Yes, sir.

"Q. That was Ralph Low? A. Yes, sir; that's right.

"Q. It is usual and customary for the fireman on these engines to watch out and call signals to you? Is that right? A. Yes, sir.

"Q. That is a universal custom, isn't it? A. That is the rule. It is the law with me.

\* \* \* \* \* \*

"Q. You saw Whitson's signal just as both of these engines were coming out of the slip, the south end of the south engine was just coming out of the slip? A. I saw the signal immediately as he gave it, the first one.

"Q. That is where you were when you first saw Whitson's signal? A. And the way he gave the signals and everything was significant there was something very wrong. What, I wouldn't know.

\* \* \* \* \* \*

"Q. Did you look to see what your fireman was doing? A. He was over on the other side working with a window."

The evidence was that no warning signals were given.

We shall now give our attention to the evidence pertaining to the question of whether the engineer, O'Sullivan, on the steam locomotive was guilty of any negligence. Let us see what the engineer, a witness for the defendant, said.

"Q. Where was Mr. Hughes riding before he alighted from your engine? A. Between the sixth and seventh car.

"Q. North of the engine? A. North of the engine.

"Q. Didn't have any south of you? A. North of the engine and tender.

"Q. Did you see him on the side of this car before he got off? A. Yes, sir.

"Q. Did you see him, or not, step off the car? A. I seen him step off the car.

"Q. Can you tell us how many steps he made before he went out of your vision? A. Three steps.

"Q. Did you actually see the diesel engine hit him or not? A. No.

"Q. But he did go out of your sight? A. He went out of my sight.

"Q. How long do you think it took him to make those three steps? A. Approximately two seconds.

"Q. Was there a wind blowing that day? A. There was.

"Q. What did you do when you saw him take those two steps and go out of sight? A. I hit the sander and shut the throttle off and set the brake.

"Q. Why did you do that? A. To stop my train, if he were knocked back from the object that was moving on the track next to me, that he wouldn't be thrown under the train I was handling.

"Q. If he were thrown under it your train would be stopped in any event? A. That's right."

Note his testimony on cross-examination:

"Q. Now, then, of course, when Jack Hughes stepped off you realized he was going to be hit by something? A. No. He went out of sight. I knew there was an object moving on that track and it could be possible for him to be knocked back into the train I was handling.

"Q. All right. Did you ever sound any whistle on your engine? A. No, sir.

"Q. There is a rule in the book that provides—it is Rule 12, or Rule 14—there is one signal in there, it talks about whistle signals. Is that right? A. Sure; that is correct.

"Q. And it provides that, 'to sound an engine whistle continuously is a signal that is to be used by one engine to stop another to avoid accidents.' Is that correct? A. That is correct."

■ Was the evidence sufficient to sustain a finding that the enginemen operating the diesels were negligent and that such negligence contributed to cause the death of Hughes? We so held in the opinion on the former appeal. After a careful re-examination of the evidence, we again hold that a case for a jury was made. We also held on the first appeal that the evidence was sufficient to authorize a finding that the enginemen, in the circumstances present at the time Hughes lost his life, owed Hughes a duty of exercising care to avoid injuring him. See 265 S.W.2d loc. cit. 280, 281(6). We there held that plaintiff's instruction assumed, without requiring a jury to find, that the enginemen owed Hughes the duty to exercise ordinary care and to take precautionary measures, and for that reason the case was remanded for retrial.

The evidence of Whitson was alone sufficient to make a case for plaintiff. Whitson, by his own evidence, disclosed that he realized Hughes was in danger even before he stepped off the freight car; that he knew Hughes in the performance of his duties was to alight where he did. He called to him at least twice and then when Hughes did alight, Whitson gave a number of emergency stop signals. Due to the fact that the enginemen were so situated that the signals were not or could not be heeded, Whitson crossed over to the opposite side of the diesel and gave the stop signal to the engineer and the diesels were stopped. According to the evidence, the lead diesel struck Hughes about the time the engineer received the stop signal from Whitson. It is evident that had the members of the crew been in such a position that a stop signal could have been heeded, Hughes would not have been harmed. For full discussion of this question, see 265 S.W.2d loc. cit. 277, 278(5). On the second trial, plaintiff's requested instructions as given by the court complied with the requirements as outlined in the opinion on the first appeal.

We ruled on the first appeal that the evidence was sufficient to submit to a jury the question of whether the engineer O'Sullivan was guilty of negligence which

contributed to the death of Jack Hughes. We do not deem it necessary to consider again this question at length. O'Sullivan, by his own evidence, disclosed that he realized Hughes was in danger when he stepped off the freight car; that he immediately stopped his train for fear that Hughes might be thrown backward and come into contact with his train and be injured. The evidence justified a finding that if O'Sullivan had complied with the rule which he admitted was in effect and sounded the whistle of his steam engine, when he first realized Hughes was in danger, the diesels could have been brought to a standstill before striking Hughes. It must be remembered that Whitson testified that he gave a number of stop signals to no avail; then crossed over to the other side and gave a stop signal about the time Hughes was struck. The diesels were moving forward during all of this time and certainly covered some distance. It is not an unreasonable conclusion to say that had Whitson's signal been heeded, Hughes would have been saved. By the same reasoning, Hughes could have been saved if O'Sullivan had sounded the whistle.

The law governing the facts of this case was carefully considered on the first appeal. Defendant in its brief insists that we were in error and that the former opinion should not control the case. After a reconsideration of the questions presented, we are of the opinion that we ruled correctly on the first appeal and, therefore, the rules there announced must govern this case. It would be useless repetition to review the law and we therefore reaffirm what we said in the first opinion. Neither would it serve any useful purpose to review the many cases cited by defendant. We have not discovered any which rule contrary to our holding in this case. In the reply brief, defendant cited Northern Pacific Ry. Co. v. Mely, 9 Cir., 219 F.2d 199, as a controlling case. A brief quotation from that case will demonstrate that the case is not in point. Note what the court said, 219 F.2d loc. cit. 204: "Here it is clear on all the evidence in this record that neither Railway nor any of its officers, agents or employees contributed to the disaster.

"Mely accomplished his own death and those of two fellow employees by a willful violation of a rule."

■ Defendant says that the trial court should have sustained challenges for cause as to fifteen of the eighteen veniremen. These jurors, when questioned about their feeling as to whether an employee injured in the course of performing his duties should be compensated answered that in their opinion some compensation should be paid irrespective of the circumstances. On further examination, these jurors were asked, in substance, if the court should instruct them that the defendant would not be liable unless negligence was proven, would they then find for the defendant. The jurors answered that they would and that they would be guided by the evidence and the instructions given by the court. The jurors were questioned at length and the trial judge overruled defendant's challenges for cause. Defendant says that the trial court and not the juror is the judge of whether the venireman is qualified to serve. That certainly is the rule. Moore v. Middlewest Freightways, Inc., Mo., 266 S.W.2d 578, loc. cit. 585, 586(8–12). In the case before us, the trial judge and not the jurors determined the qualification of the veniremen. That was the purpose of the lengthy questioning. Merely because a venireman is of the opinion that a person injured in the course of his employment should be compensated does not in and of itself disqualify a person for jury service in a personal injury suit. If that were so, then all jurors who believe that a workmen's compensation law serves the best interest of society would thereby be disqualified for jury service. In the Moore case, supra, cited by the defendant, the juror was held to be disqualified because he admitted he was prejudiced. The opin-

ion as expressed by the jurors in the case before us does not in itself show prejudice. This same question was considered in the case of Cleghorn v. Terminal R. Ass'n of St. Louis, Mo., 289 S.W.2d 13, loc. cit. 22, 23(15)(16). The point was there ruled against the defendant and we think correctly so.

■ Defendant says the trial court erred in refusing to give many of its requested instructions. The trial court gave a number of defendant's instructions. An examination of these shows that every possible defense and mitigation of damages was submitted to the jury. In substance, the jury was instructed that, to entitle her to a verdict, plaintiff had the burden to prove that defendant was guilty of negligence which contributed to the death of Hughes. Further, the jury was instructed that if the negligence of Hughes in not looking out for the oncoming diesels was the sole cause of his death, then the verdict should be for the defendant. An instruction was given that if the negligence of Hughes contributed to his death, then that fact should be considered in mitigation of damages. A number of cautionary instructions were also given. We find that the jury was fully instructed on the law governing the case.

Finally, defendant says that the verdict of $55,000 is grossly excessive. Hughes, at the time of his death, was 52 years old. He left as dependents his wife, the plaintiff, and a 15-year old son. Hughes' yearly earnings were $5,285. The jury at the first trial returned a verdict for $30,000; the second trial resulted in a verdict for $55,000.

Defendant cited Sheehan v. Terminal R. Ass'n, 344 Mo. 586, 127 S.W.2d 657; Curtis v. Atchison, T. & S. F. Ry. Co., 363 Mo. 779, 253 S.W.2d 789; and Scneder v. Wabash R. Co., Mo., 272 S.W.2d 198. In the Sheehan case, the deceased was 49 years old. He left surviving him a wife and an 11-month old daughter. He had been earning $44.80 per week. It was there said, while affirming a judgment for $34,000, that in no death case had this court approved a verdict in excess of $30,000. However, in the Curtis case, there was a widow 35 years old and a son 11 years old. The deceased had been earning $4,755 per year. We approved, after remittitur, a judgment of $40,000. The Scneder case was an action for personal injuries and is not a guide in death cases. Plaintiff has not cited any cases on this question. In a number of cases, we have discussed the question of the excessiveness of verdicts in death cases. Mooney v. Terminal R. Ass'n of St. Louis, 353 Mo. 1080, 186 S.W. 2d 450, loc. cit. 455, 456(10–12).

■ Considering the above-mentioned and other cases as well as the value of the dollar, the age of Hughes, his yearly earnings, and the other circumstances shown by the evidence, we deem $40,000 to be a liberal allowance in this case. If, therefore, plaintiff will within 15 days enter a remittitur of $15,000, the judgment will be affirmed for the sum of $40,000 to bear interest as of the date of entering the judgment, that is, September 24, 1954. Otherwise, the judgment is to be reversed and the cause remanded for retrial.

All concur.