Christeen NELSON, Administratrix of the Estate of Charles M. Nelson, Deceased (Plaintiff), Respondent,

v.

WABASH RAILROAD COMPANY, a Corporation (Defendant), Appellant.

No. 45318.

Supreme Court of Missouri, Division No. 1.

March 11, 1957.

Motion for Rehearing or to Transfer to Court en Banc Denied April 8, 1957.

Ely, Ely & Voorhees, Wayne Ely, St. Louis, John L. Davidson, Jr., St. Louis, of counsel, for appellant.

Hullverson, Richardson, Hullverson & Jeans, St. Louis, for respondent.

HYDE, Judge.

Action under Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–59, in which plaintiff had a verdict for $8,000 for her husband's conscious pain and suffering and $17,000 for loss on account of his death. Defendant has appealed from the judgment of $25,000 entered.

Defendant's only claim of error is in refusing to direct a verdict in its favor and it states two grounds for this contention. First, it says the evidence is insufficient to prove that it was negligent but instead shows that the injuries suffered by plaintiff's husband, Charles M. Nelson, resulted solely from his own negligence. Second, it says the evidence is insufficient to prove that Charles M. Nelson died as the result of his injuries.

Nelson was injured while on top of a boxcar which was pushed under the Compton Avenue Viaduct in St. Louis. The clearance was insufficient for a man standing on top of the car and he was thrown to the ground by coming in contact with the bridge. Nelson was the fireman of a switching crew which started work about 3:15 P. M. October 25, 1953. Also in the crew were the engineer, Schmazel, the foreman, Burke, the head man, Cannody and the rear man, Guinan. However, Nelson traded places with Guinan who was tired because he had worked 16 hours and then come on this shift after 8 hours rest. Defendant contends that this exchange was a violation of Rule 703(a) providing that employees "must not absent themselves from duty, exchange duties with other employees, substitute others in their place, nor engage in other business without proper authority." Other rules (836) made engineers responsible for duties and instruction of firemen, requiring a report on any incompetency or negligence and (854) required a fireman while on duty to be governed by the directions of engineman and conductor. Another rule (738) provided that men "whose duties are connected with the movement of trains, engines or cars, must familiarize themselves with the rule governing the duties of others as well as themselves, and must be prepared in case of emergency to act in any capacity to insure safety." Defendant contends that at the time of his injury Nelson was not acting within the scope of his employment as a fireman and thus was not engaged in any duty that he owed defendant; and, therefore, defendant claims it was not guilty of actionable negligence which in whole or in part caused or contributed to cause his injuries. Defendant further contends that Nelson's injuries resulted solely from his violation of Rule 703(a).

The case was submitted on two charges of negligence. Instruction No. 4 submitted failure to have tell-tale warning devices over the track (ropes or straps hanging from an overhead cable) which would give

employees notice of the low clearance bridge. Instruction No. 5 submitted failure of the engineer to stop on a signal from Cannody which the jury was required to find was given after Nelson came into a position of imminent peril of being injured by collision with the bridge and was given in time for the engineer to bring the cars to a stop before Nelson was struck. As to the first, defendant says that, for the purposes of argument in this case, it will admit negligence in not providing tell-tales. However, its position is that it had no duty to a fireman with respect to such devices because his place was in the engine cab where he could not be injured by low clearance bridges and defendant was not required to give him any warning concerning them; but because of the view we take it is not necessary to decide that question.

■ Plaintiff's evidence was that Nelson, Cannody and Burke, the foreman, rode together on the footboard of the engine when they started to work and that Burke, as foreman, had the authority of a conductor on this occasion. (Burke was not available as a witness, having died before the trial.) Schmazel, the engineer, although he said he did not see Guinan in the fireman's seat until after the casualty and did not know Nelson was relieving him, did say that he knew that Nelson and Burke had exchanged places and work from 10 to 25 times in the last two or three months and that he had never reported this as a violation of rules. Certainly both Cannody and Burke knew where Nelson was and what he was doing. (Burke stated immediately after the casualty that Nelson was acting in Guinan's place.) Therefore, if plaintiff made a case for the jury on the negligence submitted by Instruction No. 5, it is unnecessary to decide whether or not a case was made on failure to provide tell-tales. This is true because if plaintiff made a case under any theory submitted, then defendant's motion for a directed verdict and its motion after verdict for judgment were both properly denied. DeLay v. Ward, 364 Mo. 431, 262 S.W.2d 628; Holmes v. McNeil, 356 Mo. 763, 203 S.W.2d 665;

Guthrie v. City of St. Charles, 347 Mo. 1175, 152 S.W.2d 91. For the reasons hereinafter stated, we think plaintiff did make a case on negligence of the engineer.

■ Cannody said they first got cars at the Falstaff Brewery about a mile and a half from Compton Avenue and pulled them onto the main line. They went east toward the Compton Yards pushing seven cars in front of the engine which was backing, facing west, so that the engineer was on the side where he could see signals from Cannody. Nelson was on top of the head car, Cannody was on top of the car next to the engine and Burke was on the engine footboard. The train was going from five to ten miles per hour, the air was connected on all cars and engineer Schmazel said he could stop in about five feet. (There was no other evidence on stopping distance but we do not consider that this estimate includes reaction time.) Approaching the viaduct, Nelson turned and started walking west, toward the engine. Cannody thought (as did a Frisco switchman standing on the north side of the track) that he would go to the ladder on the west end of the first car and climb down to be clear of the bridge. However, he stepped over onto the second car and continued walking west. Cannody said: "And I seen he wasn't going to get down. Well, I gave a stop sign, and I looked back to the engineer. The engineer was not looking at me at the time I gave the first stop sign. * * * He was looking off to the left at the men that were out there." Cannody said the cars moved 25 or 30 feet after he started giving emergency stop signals before the engineer took his signal and at that time Nelson was no more than six or eight feet from the bridge. He said the engineer then "took my signal and like that (snapping fingers) he stopped"; but there was at least one car east of the bridge after they stopped. The men "off to the left" were Frisco switchmen. One of them, Mitchell, said he saw Nelson on the head car walking west, slower than the cars were moving; that when he stepped over to the other car he knew he wasn't coming down

the ladder; that at that time Nelson was 50 to 75 feet from the bridge; and that he punched the man next to him, Devine, and "both of us was hollering, and waving our arms trying—we was waving washouts, but they didn't see." Devine said Mitchell "began to jump up and down and wave his arms, and everything" but that he did not see Nelson himself until "a split second before he got hit."

Defendant contending "that plaintiff failed to make a submissible case under any theory" says "respondent has overlooked or ignored Cannody's testimony that he did not know whether the engineer saw the signal when first given, but that he judged he did not see it because of the distance which the car traveled after he had given the signal. He also ignores Cannody's further testimony that in reporting the accident he wrote: 'I gave an emergency stop signal and the stop was made at once', and when asked at the trial if he had so reported, he answered, 'That's right'. There is no conflict between that testimony of Cannody and the testimony of Schmazel that as the movement approached the Compton Avenue Viaduct Cannody gave him a 'wild stop sign' and that he thereupon stopped the engine."

■ However, considering Cannody's testimony as a whole, together with that of Mitchell, from the view most favorable to plaintiff, our conclusion is there was sufficient evidence from which the jury reasonably could find negligence on the part of the engineer in failing to watch Cannody for signals and to act when he first began to signal after discovering Nelson's peril; and find that if he had acted when Cannody first signaled he could have stopped the cars before Nelson came in contact with the bridge. See White v. Atchison, Topeka & Santa Fe Ry. Co., Mo.Sup., 244 S.W.2d 26, 30, certiorari denied 343 U.S. 915, 72 S.Ct. 648, 96 L.Ed. 1330; Hughes v. Terminal Railroad Ass'n, Mo.Sup., 265 S.W.2d 273, 278; Hughes v. Terminal Railroad Ass'n, Mo.Sup., 296 S.W.2d 59, 65. It reasonably could be found

that the engineer knew someone probably would be on top of the cars; that signals might be given at or near this place; and that he should be watchful and alert for signals there. To be considered also is the fact that Nelson was walking away from the bridge which gave the engineer more time to prevent his injury, by stopping the cars on the first signal, than he would have had if Nelson had been standing still. We cannot say that any negligence of Nelson in going on top of the cars to exchange places with Guinan in violation of defendant's rules or in failing to keep a proper lookout for the viaduct (defendant had evidence that he knew of its low clearance) would be the sole cause of his injury after he was discovered in a position of peril but instead hold it would be contributory negligence which would diminish his damages but not bar his recovery. 45 U.S.C.A. § 53. Certainly it would be the duty of defendant to prevent injury to Nelson when his peril was actually discovered, as it was by Cannody; and, as the above cited authorities show, the jury reasonably could find that the engineer had a duty under the circumstances to watch the man who was on the car ahead of the engine for the purpose of giving signals as they were approaching the Compton Yards; and find negligence on the part of the engineer in failing to get and heed his signals because of looking away from the track at other persons or things. We, therefore, hold that plaintiff's evidence was sufficient to make a case of negligence on the theory submitted by Instruction No. 5.

Defendant contends the evidence is insufficient to establish causal connection between Nelson's injuries and his death. When Nelson was injured on October 25, 1953, he was taken to the St. Louis City Hospital but was moved the next day to the Missouri Baptist Hospital. He remained there until November 21, 1953, when he went home, but continued to be treated by Dr. V. O. Fish, who had treated him at times prior to this casualty, beginning in 1947. Nelson remained at home until March 26, 1954, when he returned to work.

However, he was unable to continue and did no work after April 11th. On May 25th he was sent to the Wabash Employees' Hospital at Moberly and died there June 3, 1954. The records of all three hospitals and of Dr. Fish were in evidence. Plaintiff had expert testimony of three doctors, a surgeon, a pathologist and a heart specialist, based on the facts shown by these records and the testimony of Mrs. Nelson, to the effect that Nelson's injuries contributed to bringing about the heart condition that caused his death. Records of examinations prior to his injuries showed that Nelson then had higher than normal blood pressure which indicated mild hypertension and some degree of arteriosclerosis. However, the doctors could not say from the facts shown that he had a heart condition prior to his injuries. Mrs. Nelson testified that while Nelson was in the Baptist Hospital he complained of pain through his whole chest; that when he came home "he complained of his chest hurting him awful. * * * He didn't sleep much at night. * * * as he laid down, he couldn't breathe. He couldn't get his breath." She also said that when he tried to work "he said he hurt so bad, that's why he quit. * * * He couldn't make it. He hurt so bad from his chest." Because the first notation in the records as to chest pains was in the record of Dr. Fish, dated March 19, 1954, defendant argues this shows the heart condition was not caused by Nelson's injuries but commenced thereafter from some other cause. However, the testimony of Mrs. Nelson does not directly contradict the records and the jury reasonably could accept it as true, as the doctors did as a part of the basis for their opinions.

Dr. Scherman (the surgeon) in answer to the hypothetical question based on the records and the testimony stated that it was his opinion that the accident created a chain of events that caused Nelson's death. He explained his answer thus: "The injury to this man, who was a mildly hypertensive man, was subjected to severe trauma by having been knocked off a box car * * * and sustained a basal skull fracture and sustained multiple lacerations about his face and nose, he sustained fracture of the clavicle, he sustained a compression fracture of the lumbar spine. During the course of his examination and treatment there is revealed many changes in his blood pressure, shock, pain, and stress, inability to sleep, and all the companion things that go with having sustained a severe injury, and the inconvenience during it—during the time he was in treatment in a body cast for compression fracture of his spine. He begins to complain of a severe—of the myocardial, or interior chest pains, which were at that time assumed by the doctor to be possibly associated with some angina—with angina conditions, and weakness, and the man was never able to return to work except for a period of seven to ten days, and is still complaining at that time, still under stress, insomnia, nervousness, pain, he continues under the care of the clinic, and is finally referred to the Moberly Hospital at some date, in 1954, well, goes there and complains of pain, and they take an electrocardiogram, which shows changes occurring, of coronary insufficiency, or poor circulation of the coronary arteries. He suddenly dies within a period of four or five hours after he is submitted or subjected to a minor surgical operation, this surgeon's finding showing a myocardial infarction * * * the cause of death is infarction of the myocardium, which, I would say, subsequently arose and was the result of his accident."

Dr. Connor (the pathologist) in answer to substantially the same hypothetical question said, in his opinion, "there was direct relationship between the accident and the death." He also said "When this man fell, he suffered severe injuries. At a distance of thirteen feet you frequently contuse that myocardium, which is the heart muscle, from a fall of this distance, and it is something this man had—a contusion of the myocardium at the time he fell." He said he believed this because "the fall, shortness of breath, the fact he was unable to breathe

unless he sat up, all indicate cardiac trouble."

Dr. Franklin (the heart specialist) said in answer to a similar hypothetical question: "Here was a man, who, previous to his accident, had worked every day. Then he suffered a very severe serious injury in the accident, was unconscious several hours, had a brain injury, and spine injury, was in severe pain and discomfort, was hospitalized for a long time; he was able to go back to work only for a short time, then had to give it up, because he just couldn't keep going, and who then died in June, a number of months after the injury. The autopsy showed myocardial infarct. It is my belief this man developed injury to his heart from the accident, because of the coronary insufficiency, which gradually increased enough to cause myocardial infarction and his death." He also said any injury of the left clavicle "can at the same time injure the heart."

We think the facts shown and the expert medical testimony concerning them was sufficient substantial evidence from which the jury reasonably could find that Nelson's injuries directly contributed to cause his death. See Schaefer v. Rechter, Mo.Sup., 290 S.W.2d 118; Manley v. American Packing Co., 363 Mo. 744, 253 S.W.2d 165; Stephens v. Spuck Iron & Foundry Co., 358 Mo. 372, 214 S.W.2d 534; Waterous v. Columbian National Life Ins. Co., 353 Mo. 1093, 186 S.W.2d 456. Defendant further says that plaintiff alleged "an aggravation of an existing coronary sclerosis, arteriosclerosis and hypertension" and argues there is no evidence Nelson had any such previous condition to be aggravated by his injuries. This allegation was added by amendment of the petition and there was at least evidence of the two latter conditions. However, the petition after alleging all the various injuries suffered by Nelson alleged that he "died as a direct result of said injuries", so we do not see any basis in this contention for holding that plaintiff did not make a jury case on the issue of whether or not Nelson's injuries directly

contributed to cause his death. Our conclusion is that plaintiff did make a case for the jury on this issue.

The judgment is affirmed.

All concur.