**Harold E. BAKER, Respondent-Plaintiff,**

v.

**THOMPSON–HAYWARD CHEMICAL COMPANY, Appellant-Defendant.**

No. 22777.

Kansas City Court of Appeals.

Missouri.

Oct. 6, 1958.

Reed O. Gentry, Gene C. Morris, Rogers, Field, Gentry & Jackson, Kansas City, for appellant.

Len L. Balke, William R. Kelly, Balke & Kelly, Kansas City, for respondent.

CAVE, Judge.

This is an action for damages for personal injuries in which the plaintiff obtained a verdict and judgment for $3,200, and defendant perfected its appeal.

The petition alleges that on March 9, 1952, while planitiff was walking along Greystone Boulevard, a public street in Kansas City, Kansas, and in the immediate vicinity of defendant's plant, he was badly injured, due to the negligence of the defendant when a heavy fog of noxious and poisonous gas emanated from said plant and covered the immediate area where plaintiff was walking; that by reason of breathing and inhaling said gas, he received severe injury to his throat, lungs, chest, skin and body; and that said gas would not and could not have escaped from defendant's plant without negligence on its part. Defendant's answer was a general denial.

It is not contended on appeal that the evidence is insufficient to make a submissible case of res ipsa loquitur or that the verdict is excessive; consequently, it will not be necessary to state the evidence in detail.

Defendant was engaged in bottling "chlorine gas"; its plant was located immediately adjacent to Greystone Boulevard; it receives the liquid chlorine in railroad tank cars at a railroad dock; it attaches a seamless steel pipe one inch in diameter to the top of the car and the chlorine passes through the pipe by applying air pressure of approximately 175 pounds at the top of the car; the pressure is subject to variance up to 225 pounds by change in temperature; the pipe was approximately 387 feet in length; on the line between the tank car and defendant's plant where certain receptacles were filled, was an attached cylinder located on the roof of one of defendant's buildings; this cylinder was used as a relief receptacle in case of overflow; and when certain valves in the pipe system were closed, it would shut off further flow of chlorine.

March 9th was Sunday, and the plant was not in operation. Plaintiff was walking along the adjacent street and within 10 or 12 feet of the plant when he heard an "explosion" therein; he fell to the street; he heard a second explosion, and when he arose, there was a "cloud of gas" escaping from the plant and surrounding the plaintiff; he made his escape, but not before breathing and inhaling the gas, and claims that he was injured as the result thereof.

Other witnesses testified for the plaintiff that they heard the explosion, and when they reached the scene, there was a foul odor in the air. Some one called the police and fire department. When the firemen came, they put on gas masks and entered the building, but would not permit anyone else to enter. Mr. Hart, defendant's engineering manager, came within a few minutes and went to the roof of the building and found a six inch break in the safety cylinder, and another rupture in the pipe, both of which would permit the chlorine to escape. He did not know the cause of the breaks. He also testified that when pressure is released from liquid chlorine, it will become a gas and is heavier than air, with a tendency to settle on the ground.

The next day after the explosion, plaintiff was treated by Dr. Louis V. Miller, who testified that he made a thorough examination of the plaintiff and found he "had gaseous poisoning", and prescribed certain medicines. Plaintiff was still under the doctor's care at the time of the trial, and during this period he had observed facial swellings, loss of weight, a livid skin and labored breathing.

Drs. Leitch and Buckingham testified for the defendant and stated that they had examined the plaintiff and found no disability existing as the result of exposure to "obnoxious gases".

The case was tried and submitted on the res ipsa loquitur theory, and it is not contended by the defendant that the evidence is insufficient to submit such a theory. However, it criticizes plaintiff's Instruction No. 1 because (a) it "gave to the jury a roving commission to find negligence on the part of the defendant * * *"; and (b) it "failed to require the jury to find that the gas which erupted * * * was dangerous under the conditions present, or created an unsafe condition".

Plaintiff's Instruction No. 1 required the jury to find that the defendant occupied, used and controlled a certain building adjacent to Greystone Boulevard; that plaintiff was walking along said boulevard; that an explosion occurred in said building; that a "cloud of gas" suddenly erupted therefrom, covering the area about plaintiff; that he breathed and inhaled the same; that he was injured thereby; "and if you further find that the defendant failed

to use ordinary care to avoid said explosion and said eruption of gas, if so, and was thereby negligent, if you so find, then your verdict must be for the plaintiff, * * '*'". Defendant criticizes the quoted clause and says it gives the jury a roving commission to find negligence. Defendant does not point out any additional facts or issues that should have been included.

If plaintiff's case had been tried and submitted on specific negligence, there might be merit in defendant's contention, but this is a res ipsa case, and the difference in the submission of such a case and one for specific negligence is clearly pointed out in Harke v. Haase, 335 Mo. 1104, 75 S.W.2d 1001, 1004. It is there stated that in a res ipsa case, *"the existence of some negligence,* may be shown by a particular kind of circumstantial evidence, namely, an *unusual* occurrence of a character which ordinarily results only from negligence, * * * and from which, therefore, negligence is a reasonable inference; while in a specific negligence case the careless acts or omissions which constitute negligence must be stated and proven. In other words, in a res ipsa case the ultimate fact, *some kind of negligence* is inferred without any evidential facts except the *unusual* occurrence itself; while in a specific negligence case there must be evidential facts sufficient to show some negligent acts or omissions which were the proximate cause of the occurrence".

Plaintiff's Instruction No. 1 clearly requires the jury to find an *unusual occurrence* of a character which ordinarily results only from negligence. Plaintiff did not know what caused the explosion and would not be required to include a finding of the cause in his instruction.

Furthermore, this being a res ipsa case, the plaintiff could have, and it would have been better practice if he had, informed the jury, in Instruction No. 1, that if it found the facts enumerated, such facts would be sufficient substantial evidence to *warrant* a finding that the defendant was negligent, unless it should find and believe from all the facts and circumstances in evidence that the occurrence was not due to defendant's negligence. This declaration was clearly set out in plaintiff's Instruction No. 2, which referred to the facts required to be found in Instruction No. 1. The criticized language of plaintiff's instruction is substantially the same as the approved closing language of the instruction in Harke v. Haase, supra, 75 S.W.2d 1004.

It is usual and is the better practice to include in one instruction the requirements that are found in plaintiff's Instructions 1 and 2, but the fact that they are in separate instructions is not prejudicially erroneous. This exact question was ruled in Counts v. Coca-Cola Bottling Co., Mo. App., 149 S.W.2d 418, 421.

When plaintiff's Instructions 1 and 2 are read and considered together, they include all the essential elements of a res ipsa instruction as outlined and approved in Harke v. Haase, supra, and many other cases decided subsequent thereto.

We have considered defendant's citations on this point and consider them not controlling because they are not discussing instructions in a res ipsa case.

Defendant also contends that Instruction No. 1 is erroneous because it does not require the jury to find that the escape of the chlorine gas created a dangerous and unsafe condition. There was evidence that this gas will kill vegetation if exposed in quantity, and will cause irritation of the membrane of the nose, throat and lungs, and did so in this case. Defendant's engineer testified that they bottled this gas to be sold to customers who desired to purify water and sewage. Webster's New International Dictionary, Second Edition, defines "chlorine" as "a heavy greenish-yellow irritating gas of disagreeable odor. When inhaled in quantity, it is poisonous. * * * It is an essential ingredient of most war gases". The same definitions

and conclusions are recognized in medical treatises such as Legal Medicine Pathology and Toxicology, Gonzales et al., page 717, and Dorland's Medical Dictionary.

■ We think it is clear that the release of a poisonous gas at a place where people are or have the right to be, would create a dangerous and an unsafe condition as a matter of law. Under such circumstances, it was not necessary for the instruction to require the jury to so find, because it is not a factual issue. This principle is recognized in Reese v. Illinois Terminal Railroad Co., Mo., 273 S.W.2d 217, 222 (5, 6).

In addition to the Reese case, the defendant cites Wagner v. Missouri-Kansas-Texas R. Co., Mo., 275 S.W.2d 262, 50 A.L.R.2d 1062, and Davies v. Shawver, 134 Kan. 772, 8 P.2d 953. In the Reese case, the negligence charged was permitting the accumulation of ice and snow at a certain point; in the Wagner case, the negligence was in permitting water on the floor which caused plaintiff to fall; and in the Davies case, the defendant was charged with negligently leaving a piece of pipe by the roadside. We do not consider these cases controlling because the accumulation of ice and snow on the ground, or water on a floor, or a pipe by the roadside may or may not create a dangerous situation and is a factual issue to be decided by the jury; whereas, permitting the escape of poisonous gas in quantity, as in this case, creates a dangerous condition as a matter of law.

Defendant's last contention is that the court erred in permitting plaintiff to testify that he had ten children and in permitting plaintiff's counsel to mention that fact in his closing argument.

The record discloses that one of the elements of damage claimed in plaintiff's petition was loss of earnings resulting from the alleged injuries. While plaintiff was in the process of presenting his case in chief, defendant's counsel, on cross-examination, interrogated plaintiff as to whether or not he had really lost any earnings as a result of those alleged injuries; as to what his earnings had actually been during the years immediately following such injuries. He inquired as to whether or not plaintiff had any records revealing how much time and what earnings, if any, he had lost. Plaintiff responded that he did not know what his earnings had been for any of these years; that his records were not up to date, and that he could not testify as to the exact amount of his earnings in any one year or what sums he had lost by reason of his injuries. Counsel for defendant's final question on cross-examination was: "Q. You admit, Mr. Baker, that since 1953 you have not filed a single income tax return, either withholding or of your income? A. That is right". Immediately thereafter and on redirect examination, plaintiff's attorney asked: "Q. How many children do you have?" Defendant objected to this question. In a colloquy before the court, but out of the hearing of the jury, plaintiff's attorney asserted that the question and answer would amount to a reasonable and good-faith explanation of plaintiff's failure to file income tax returns; that his failure to make such returns had been injected into the evidence by defendant and consequently plaintiff was entitled to give his reason or explanation for such failure. Counsel for defendant contended that an individual's liability to make a return is not determined by the number of his children and that, therefore, such evidence was not a valid or proper explanation and that the reception of such evidence would be prejudicial to defendant. Defendant's objection was overruled and plaintiff answered that he had ten children.

■■ It is well settled in this state that in an action for personal injuries it is usually error to permit plaintiff to prove the number of the members of his family. Ordinarily, such evidence is immaterial and irrelevant to any issue in the case and the only purpose and object its presentment could have would be to excite and inflame the jury and thereby to enhance the assessment of damages. For an array of cases

discussing this question see 10 Mo.Dig. Damages, ▓▓▓ However, as stated in 31 C.J.S. Evidence § 163, p. 874, "Explanatory evidence is equally competent to diminish the force of unfavorable facts shown by the opposing party * * *". In Larabee Flour Mills v. West Plains Commission Co., 216 Mo.App. 257, 262 S.W. 389, loc.cit. 391, the court said: "It is a well-established rule of law in this state that, where one party to a controversy invites incompetent evidence, he estops himself from objecting to the other party following it up with testimony tending to explain his side of the controversy. See Reynolds v. Maryland Casualty Co., 274 Mo. [83], loc.cit. 103, 201 S.W. 1128".

We find the following statement in Greenleaf on Evidence, 16 Ed., Vol. 1, p. 600: "So far as the evidence of the opponent is to be explained away, contradicted, or otherwise refuted, by any process which consists merely in diminishing or negativing its force, the original party has the right to do this, either by a re-examination following immediately upon the cross-examination of his witness, or by new witnesses called in rebuttal after the opponent's own evidence has been put in".

To the same effect is the following quotation from Conrad Modern Trial Evidence, Vol. 2, Sec. 1187, p. 348: "A subject or conversation introduced by counsel on cross-examination may be fully explored on redirect examination and the whole transaction brought out. The court may on redirect examination permit a witness to explain answers given on cross-examination by giving his undisclosed intent, motive or mental state, or reasons for making the statement or doing an act, even though the reasons are immaterial".

Two Missouri cases are cited in the footnote as authority for the statement just quoted.

In Couch v. St. Louis Public Service Co., Mo.App., 173 S.W.2d 617, loc.cit. 623–624, the St. Louis Court of Appeals said: "The ordinary function of redirect examination is to afford a witness an opportunity to explain or avoid the consequences of new matter brought out on his cross-examination, and to rebut the discrediting effect of damaging statements or admissions elicited from him. City of St. Louis v. Worthington, 331 Mo. 182, 52 S.W.2d 1003; State ex rel. State Highway Commission v. Bengal, Mo.App., 124 S.W.2d 687. The scope and extent to which redirect examination shall be permitted to go rests largely in the sound discretion of the trial court (State ex rel. State Highway Commission v. Bengal, supra); and where the one party, on cross-examination of a witness, opens up a line of inquiry which is designed to discredit the witness in the eyes of the jury, the courts go very far, as the reported cases show, in permitting the other party, on redirect examination, to bring out those aspects of the matter which are favorable to the witness, even though, without the foundation afforded by the cross-examination, the evidence thus brought out would be wholly unjustifiable. Long v. F. W. Woolworth Co., 232 Mo.App. 417, 109 S.W.2d 85; Pfiffner v. Kroger Grocer & Baking Co., Mo.App., 140 S.W.2d 79; Larkin v. Wells, Mo.App., 12 S.W.2d 510".

In Lesch v. Terminal R. R. Ass'n of St. Louis, Mo., 258 S.W.2d 686, 691, our Supreme Court said this: "Courts may on redirect examination permit witnesses to explain answers given on cross-examination although the reason for the answer be immaterial. Johnson v. Minihan, 355 Mo. 1208, 200 S.W.2d 334, 336(1–4); 70 C.J. 698, §§ 852, 856, 857; 58 Am.Jur. 314, § 562".

Defendant's question as to whether or not plaintiff had filed any income tax returns, coupled with plaintiff's answer that he had not, was defendant's parting shot in his cross-examination effort to show that plaintiff's earnings through the years had not been very substantial. In addition it cast a cloud upon plaintiff's credibility as a witness. At this stage of the proceedings, and without any further enlightenment, defendant would have been able logically to argue to the jury that (1) either plaintiff

had never made more than $600 per year, since he had filed no income tax return, or (2) if plaintiff had received a larger income, then he had defrauded his government and was not worthy of belief. Confronted as he was with this dangerous and possibly disastrous dilemma, we believe that plaintiff was entitled to make an explanation if he had one, inasmuch as the fact that he had filed no income tax returns had been brought out by the adverse party. We believe that plaintiff was entitled, in good faith, to give his explanation, if he had any, and in effect to state why he had not made any income tax returns for the years in question.

Technically defendant is correct in his assertion that an individual's requirement to file an income tax return is not determined by the number of his children or dependents. However, it is also possibly true that many persons whose incomes do not exceed the total deductible allowances for all of their dependents do not file returns, believing that in such instances since they owe no tax, they are not defrauding their government by failure to file. In any case, if this was plaintiff's reason for not having filed such returns, we believe he was entitled to give that explanation even though it did not amount technically to a complete legal justification.

The jury could then consider such explanation with all the other evidence, including the fact that he had filed no tax returns, in reaching their conclusions on two pertinent questions which were before them for decision, namely, the amount of plaintiff's yearly earnings after the alleged injuries and his credibility as a witness. It is, we think, the law and simple justice to permit a party litigant to make such an explanation.

We are of the opinion that defendant's question opened the door and not only made it permissible for plaintiff to explain his failure to file any tax returns, but as a practical matter of trial tactics, made it incumbent upon him to do so in an effort to rehabilitate himself as a witness and resurrect his lawsuit from the alternative implications that he had either made no substantial yearly earnings or was guilty of defrauding the government.

In order to present the record fully on this point, two other facts deserve mention and comment. First, on final submission, the court withdrew from the jury the element of damages, based upon the allegation of loss of earnings. Second, defendant offered and there was received in evidence as an exhibit, a doctor's written report covering his medical examination of plaintiff. This report contained a statement that the plaintiff was at that time, which was a date preceding the trial, the father of nine children. The trial court determined and was, of course, required to determine, the propriety of the criticized question at the time it was propounded. We prefer to so decide it on appeal and without attempting to buttress our conclusion by reliance upon either of these last mentioned occurrences.

Under the circumstances as presented in this case, we hold it was not reversible error to receive plaintiff's explanation and permit the question to be answered.

The judgment is affirmed.

All concur.